ACCEPTED
05-15-00776-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
10/23/2015 2:40:59 PM
LISA MATZ
CLERK

05-15-00776-CV

IN THE FIFTH COURT OF APPEALS
DALLAS, TEXAS

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
10/23/2015 2:40:59 PM
LISA MATZ
Clerk

KSADD, L.L.C.,

*Appellant*

v.

Joan Williams,

*Appellee*

Interlocutory Appeal From County Court at Law No. 4,
Dallas County, Texas, Cause No. CC-14-03455-D,
Hon. Ken Tapscott Presiding

**Brief for Appellee**

TED B. LYON & ASSOCIATES, P.C.

John Hallman (24092474)
Marquette Wolf (00797685)
Ben Taylor (19684500) [btaylor@tedlyon.com]
18601 LBJ Freeway, Suite 525
Mesquite, Texas  75150-5632
Telephone:  (972) 279-6571
Facsimile:  (972) 279-3021

Counsel for the Appellee,
Joan Williams

**Oral Argument (*Conditionally*) Requested**

## Identity of Parties and Counsels

Supplementing KSADD, L.L.C.'s listing of appellate counsel, appellee Joan Williams is additionally represented in this interlocutory appeal by Ben Taylor (19684500) of Ted B. Lyon & Associates, P.C.

## Joan Williams's Statement Regarding Oral Argument

"A party desiring oral argument **must** note that request on the front cover of the party's brief." Tex. R. App. P. 39.7 (emphasis added). KSADD, L.L.C. did not request oral argument until page 4 of its opening brief, there asserting oral arguments would "allow the Court to more completely understand the facts and legal issues presented **_by this appeal_**" (emphases supplied). Joan Williams respectfully submits instead that (1) KSADD, L.L.C.'s interlocutory appeal was taken without sufficient cause (*cf.* RR47-48), and (2) the decisional process would not be significantly aided by oral argument. Tex. R. App. P. 39.1, 45.[1]

Moreover, KSADD, L.L.C. filed an opening brief inappropriately citing numerous appellate decisions, alleged National Fire Safety Protection Association "Life Safety Code" provisions, alleged accreditation requirements, federal regulations, Professor Prosser and the *Restatement (Second) of Torts*, which the

---

[1] *Cf. Cage v. Methodist Hosp.*, No. 01-14-00341-CV (Tex. App.--Houston [1st Dist.] July 9, 2015, no pet.) (mem. op.) (decided without oral arguments) (discussing and applying *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496 (Tex. 2015), First court held **no** expert report was required under chapter 74 — even though premises plaintiff's petition judicially admitted she had "gone [to the hospital] for the purpose of assisting a patient" and "Plaintiff is patient's nurse").

record shows the trial court never got a chance to consider. KSADD, L.L.C. also inappropriately appended behind its appellate brief numerous documents (including hearsay correspondences) dehors the record and which trial court also never got a chance to consider.[2]

The appellate record further fails to show KSADD, L.L.C. offered (or that the trial court admitted) *any* exhibits during the June 1 hearing. RR4-57 (appendix); *see also* CR91, 180 (neither KSADD, L.L.C.'s proposed written order, nor the written order actually signed by the trial court, stated that any affidavit or other documents were actually admitted and considered).[3] Compare *Loaisiga v.*

---

[2] *See* Tex. R. App. P. 33.1(a)(1)(A) ("***the record*** must show that" a "timely" motion, request or objection stated "***specific*** grounds" as a ***prerequisite*** to presenting "a complaint for appellate review") (emphases supplied); Tex. R. App. P. 34.1 ("The appellate record consists of the clerk's record and, if necessary to the appeal, the reporter's record"); *Perry v. Del Rio*, 66 S.W.3d 239, 261 (Tex. 2001) ("an appellate court's review is confined to the record before the trial court when the trial court acted. . . . [T]he court of appeals erroneously looked outside the record that was before the trial court when it [acted]"); *Cantu v. Horany*, 195 S.W.3d 867, 870 (Tex. App.--Dallas 2006, no pet.) ("An appellate court cannot consider documents cited in a brief and attached as appendices if they are not formally included in the record on appeal"); *Dallas Market Center v. The Swing, Inc.*, 775 S.W.2d 838, 842 (Tex. App.--Dallas 1989, no writ) ("At the very most, the exhibits that were tendered to this Court, absent a showing that they were properly offered into evidence and that the trial court admitted them into evidence during trial, are loose exhibits, forming no part of the record proper").

[3] Compare *Nichols v. Lin*, 282 S.W.3d 743, 749 (Tex. App.--Dallas 2009, no pet.) ("Lin's affidavit was admitted into evidence"), and *Le Meridien Hotels & Resorts v. LaSalle Hotel Operating P'ship, L.P.*, 141 S.W.3d 870, 876 (Tex. App.--Dallas 2004, no pet.) ("Despite LaSalle's statement in its brief and at oral argument that it had 'walked the court through' the evidence in Volume 5, we cannot consider material that was not admitted into evidence in our review"), *overruled on unrelated ground by Capital Tech. Info. Serv.s, Inc. v. Arias & Arias Consultores*, 270 S.W.3d 741, 755 (Tex. App.--Dallas 2008, pet. denied) (en banc); with RR49, 50-51, 53, 56 (trial court observing during hearing: "There's no evidence in [*sic*] the motion that she knew that she was assuming these duties voluntarily. . . that she's there to assist in the rendering of healthcare. . . . [M]y biggest problem is this idea that they were assisting in the

*Cerda*, 379 S.W.3d 248, 258 (Tex. 2012) (appellate court reviewing a chapter 74 interlocutory appeal should consider "the entire court record, including pleadings, motions and responses, and relevant ***evidence*** properly ***admitted***" to determine whether a particular "contact at issue was part of medical care, or health care, or safety or professional or administrative services directly related to health care") (emphases supplied), and CR42 (KSADD, L.L.C.'s dismissal motion acknowledging court should review "the entire court record, including the pleadings, the motions, the responses, and the relevant evidence properly admitted") (citing *Loaisiga*), with *Valley Regional Med. Center v. Camacho*, No. 13-14-00004-CV (Tex. App.--Corpus Christi May 14, 2015, no pet.) (mem. op.) (Slip op. at 4) ("The judgment [*sic*] denying the motion specifically stated that the exhibits ***offered*** [by Valley Regional Medical Center] at the hearing were ***admitted*** and ***considered*** in evaluating the motion to dismiss") (emphases supplied), and *In re Zimmer, Inc.*, 451 S.W.3d 893, 902 (Tex. App.-- Dallas 2014) (orig. pro.) (this Court rejecting argument that the moving party's motion was "factually uncontroverted" with the following explanation: "the trial court did not announce that it would rely on the affidavits as evidence and [the

---

rendering -- or providing of healthcare . . . without some -- some evidence to show that she knew she was . . . . ***[I]t is so factually intensive*** . . . . [T]here's a stronger argument to be had from [KSADD, L.L.C.]'s side if she was actually participating as the responsible adult at the moment she was injured") (emphases supplied).

non-moving party] did not agree to the use of affidavits as evidence of [the moving party's] claims").

Appellee Joan Williams respectfully requests summary affirmance without the additional delay that would be necessitated by scheduling oral arguments before a panel. Alternatively, if the Court determines this interlocutory appeal by KSADD, L.L.C. merits oral arguments, then appellee Joan Williams respectfully requests the opportunity to participate.

# Table of Contents

**Page**

Identity of Parties and Counsels ...................................................................2

Joan Williams's Statement Regarding Oral Argument ............................................2

Index of Authorities ...............................................................................7

Joan Williams's Objections to KSADD, L.L.C.'s Statement of The Case ............10

Joan Williams's Reply and/or Cross Issues Presented ...........................................11

Joan Williams's Objections to KSADD, L.L.C.'s Statement of Facts (and, Alternatively, Joan Williams's Competing Statement of Facts) ...................12

Joan Williams's Summary of Argument ...........................................................18

Joan Williams's Arguments and Authorities .......................................................21

I.      Ms. Williams's Claim is Not a Chapter 74 Health Care Liability Claim Subject to the Medical Expert Report Requirement ..........................21

II.     There Was and Is No "Presumption" that Ms. Williams's Premises Liability Claim Was Instead a Health Care Liability Claim.........29

Conclusion and Prayer for Relief.....................................................................31

Certificate of Word Count Compliance .............................................................34

Certificate of Filing and Service .....................................................................35

Appendix (reporter's record of June 1 motion to dismiss hearing).....................post

# Index of Authorities

**Page(s)**

**Constitutional Provisions**

U.S. Const. amend XIV, § 1 ...................................................................................15

**Case Law**

*Archer v. Tunnell*,
　　No. 05-15-00459-CV (Tex. App.--Dallas June 23, 2015, n.p.h.) .................20

*Cage v. Methodist Hosp.*,
　　No. 01-14-00341-CV (Tex. App.--Houston [1st Dist.]
　　July 9, 2015, no pet.) (mem. op.).....................................................................2

*Cantu v. Horany*,
　　195 S.W.3d 867 (Tex. App.--Dallas 2006, no pet.) .........................................3

*Capital Tech. Info. Serv.s, Inc. v. Arias & Arias Consultores*,
　　270 S.W.3d 741 (Tex. App.--Dallas 2008, pet. denied) (en banc)..................3

*Dallas County v. Sides*,
　　430 S.W.3d 649 (Tex. App.--Dallas 2014, no pet.) .......................................20

*Dallas Market Center v. The Swing, Inc.*,
　　775 S.W.2d 838 (Tex. App.--Dallas 1989, no writ).........................................3

*Davis v. City of Robinson*,
　　919 S.W.2d 849 (Tex. App.--Austin 1996, writ denied) (per curiam)..........32

*Director, State Employees Workers' Comp. Div. v. Evans*,
　　889 S.W.2d 266 (Tex. 1994) ..........................................................................13

*Duncan v. Cessna Aircraft Co.*,
　　665 S.W.2d 414, 439 (Tex. 1984) (dissent) ...................................................15

*Garland Community Hosp. v. Rose*,
　　156 S.W.3d 541 (Tex. 2004) ..........................................................................31

*Harris Methodist Fort Worth v. Ollie*,
　　342 S.W.3d 525 (Tex. 2011) (per curiam) .....................................................31

*In re MetroPCS Commc'ns, Inc.*,
　　391 S.W.3d 329 (Tex. App.--Dallas 2013, orig. pro.)....................................18

*In re Zimmer, Inc.*,
  451 S.W.3d 893 (Tex. App.--Dallas 2014) (orig. pro.)................................ 4-5

*Le Meridien Hotels & Resorts v. LaSalle Hotel Operating P'ship, L.P.*,
  141 S.W.3d 870 (Tex. App.--Dallas 2004, no pet.) ........................................3

*Loaisiga v. Cerda*,
  379 S.W.3d 248 (Tex. 2012) ................................... 3-4, 11, 13-14, 21, 30-31

*Lucas v. United States*,
  757 S.W.2d 687 (Tex. 1988) ......................................................................22

*McCain v. NME Hosps., Inc.*,
  856 S.W.2d 751 (Tex. App.--Dallas 1993, no writ)......................................18

*Michiana Easy Livin' Country, Inc. v. Holten*,
  168 S.W.3d 777 (Tex. 2005) .......................................................................12

*Nichols v. Lin*,
  282 S.W.3d 743 (Tex. App.--Dallas 2009, no pet.) ........................................3

*Parex Resources, Inc. v. ERG Resources, LLC*,
  427 S.W.3d 407 (Tex. App.--Houston [14th Dist.] 2014,
  pet.s granted 10-23-2015) (supreme court cause nos. 14-0293
  and 14-0295 [Brown, J., not sitting] consolidated for oral argument).... 12-13

*Perry v. Del Rio*,
  66 S.W.3d 239 (Tex. 2001) ...........................................................................3

*PopCap Games, Inc. v. MumboJumbo, LLC*,
  350 S.W.3d 699 (Tex. App.--Dallas 2011, pet. denied)...............................20

*Ross v. St. Luke's Episcopal Hosp.*,
  462 S.W.3d 496 (Tex. 2015) ...................................... 2, 11, 14, 20-24, 29, 30

*Scoresby v. Santillan*,
  346 S.W.3d 546 (Tex. 2011) .......................................................................21

*Texas & Pac. Ry. Co. v. Van Zandt*,
  159 Tex. 178, 317 S.W.2d 528 (1958) .........................................................15

*Valley Regional Med. Center v. Camacho*,
  No. 13-14-00004-CV (Tex. App.--Corpus Christi May 14, 2015,
  no pet.) (mem. op.) ........................................................................ 4, 14, 22-23

**Statutes**

Tex. Civ. Prac. & Rem. Code Ann.
  § 51.014 (Vernon 2015)...............................................................................11

Tex. Civ. Prac. & Rem. Code section 74.351 ..................................................... 10, 11

**Rules of Procedure and Evidence**

Tex. R. App. P. 2.................................................................................................32

Tex. R. App. P. 33.1(a)(1)(A) ..............................................................................3

Tex. R. App. P. 34.1.........................................................................................3, 26

Tex. R. App. P. 38.1(d) ......................................................................................10

Tex. R. App. P. 38.1(g) ......................................................................................12

Tex. R. App. P. 39.1 ............................................................................................2

Tex. R. App. P. 39.7 ............................................................................................2

Tex. R. App. P. 45.................................................................................... 2, 20, 32

Tex. R. App. P. 49.9.........................................................................................32

Tex. R. App. P. 9.4(d) ......................................................................................10

Tex. R. App. P. 9.4(*i*) ......................................................................................10

Tex. R. Civ P. 97(a) ..........................................................................................19

Tex. R. Civ. P. 166a(c), (f), (*i*)........................................................................13

Tex. R. Evid. 101(b)...........................................................................................14

Tex. R. Evid. 103(a)(2) ......................................................................................14

Tex. R. Evid. 802 ...............................................................................................14

**Regulation**

Tex. Admin. Code § 135.10(b) ............................................................................28

**Other Authorities**

http://www.stanleyaccess.com/automatic-swing-door-operators ...........................27

http://www.stanleyaccess.com/manual-icu-ccu-doors ...........................................27

**Joan Williams's Objections to KSADD, L.L.C.'s Statement of The Case**

The lengthy, single-spaced "**<u>STATEMENT OF THE CASE</u>**" on pages 2-3 of KSADD, L.L.C.'s opening brief violates Tex. R. App. P. 9.4(d), which requires that text in a brief "be double-spaced," and Tex. R. App. P. 38.1(d), which requires that appellants make a "*concise*" statement of "the *nature* of the case (*e.g.*, whether it is a suit for damages, on a note, or involving a murder prosecution)" and such statement "*should not* discuss the facts" (emphases supplied). *Compare* Tex. R. App. P. 9.4(*i*) (excepting "statement of the case" from appealing party's word count limitations). The following concise statement would have been appropriate:

This is a suit for damages brought by appellee Joan Williams eventually against KSADD, L.L.C. and other defendants. CR9-14, 27-37. All the defendants filed a motion to dismiss under chapter 74 of the Texas Civil Practice and Remedies Code, asserting (1) Ms. Williams's claim against them was a health care liability claim, and (2) Ms. Williams had not served the required expert report under section 74.351. CR38-53, 126-147. Ms. Williams took a non-suit as to the defendants other than KSADD, L.L.C., but she otherwise: (1) responded in opposition to KSADD, L.L.C.'s motion to dismiss, and (2) cross-moved asking the trial court to determine that chapter 74 does not apply to her premises liability claim against KSADD, L.L.C. CR92-108.

Two days after holding a recorded hearing on June 1, the trial court signed on June 3, 2015, a written order denying KSADD, L.L.C.'s motion to dismiss and decreeing that chapter 74 does not apply. RR1-57 (appendix); CR180. KSADD, L.L.C. filed its notice of interlocutory appeal on June 23, 2015, and has thus already avoided the September 1, 2015 "**JURY TRIAL**" setting for this case. *See* CR5-6, 191 ("*SPECIAL SET #1*"); Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(9), (b) (Vernon 2015) (a permitted interlocutory appeal from the denial of a motion under section 74.351(b) "stays the commencement of a trial in the trial court pending resolution of the appeal").

### Joan Williams's Reply and/or Cross Issues Presented

1. Whether the trial court correctly denied KSADD, L.L.C's motion to dismiss because the *Loaisiga* presumption does not apply, because KSADD, L.L.C. failed to introduce required evidence to support its dismissal motion, and because KSADD, L.L.C.'s motion is also without merit in light of *Ross v. St. Luke's Episcopal Hospital*, 462 S.W.3d 496 (Tex. 2015), *rev'g* 459 S.W.3d 617 (Tex. App.--Houston [14th Dist.] 2013).

2. Whether this Court should strike (and refuse to consider) appendix items KSADD, L.L.C. improperly attached behind its opening brief without first giving the trial court an opportunity to consider them in the first instance (specifically **appellant's improper appendix items 2, 3, 4, 6, and 7 and all appellate cites)**.

To the Honorable Fifth Court of Appeals:

Joan Williams files this appellee's brief on or before November 11, 2015, and requests that the order appealed from be summarily affirmed.

**Joan Williams's Objections to KSADD, L.L.C.'s Statement of Facts (and, Alternatively, Joan Williams's Competing Statement of Facts)**

Ms. Williams objects to the "**STATEMENT OF FACTS**" at pages 6-13 of KSADD, L.L.C.'s opening brief.[4] KSADD, L.L.C. has improperly briefed this interlocutory appeal as if all of KSADD, L.L.C.'s trial court filings were admitted into evidence. A review of the record shows KSADD, L.L.C. did not offer a single exhibit into evidence and did not request nor obtain any oral or written ruling admitting a single exhibit into evidence. *See* RR4-57 (copy of reporter's record appended behind this brief); CR91, 180.

This is ***not*** an appeal from denial of a special appearance, where *in personam* jurisdiction is at issue, and "evidence" is sometimes merely filed with the clerk. *See Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 781-84 (Tex. 2005); *but see Parex Resources, Inc. [Parex Resources (Bermuda), Ltd.] v. ERG Resources, LLC*, 427 S.W.3d 407, 417-19 (Tex. App.--Houston [14th Dist.] 2014, pet.s granted 10-23-2015) (supreme court cause nos. 14-0293 and 14-0295

---

[4] *See generally* Tex. R. App. P. 38.1(g) ("***Statement of facts***. The brief must state concisely and without argument the facts pertinent to the issues or points presented. In a civil case, the court will accept as true the facts stated unless another party contradicts them. The statement must be supported by record references").

[Brown, J., not sitting] consolidated for oral argument).[5]   Nor is this an appeal

from the denial of a motion for new trial after a default judgment, where affidavits

merely attached to the motion can be considered evidence without being offered at

a hearing.[6]   Nor is this a summary judgment appeal, where affidavits and other

documents would only need to be timely filed and served in order potentially to

qualify as summary judgment "evidence."[7]

The record of this chapter 74 interlocutory appeal shows KSADD, L.L.C.

cited *Loaisiga* to the trial court (albeit redundantly, inaccurately and inconsistently)

some ***sixty-five (65) times***.[8]   And despite KSADD, L.L.C.'s repeated inaccurate

citations, there is no disputing *Loaisiga*'s teaching about the applicable scope of

review.  *See Loaisiga v. Cerda*, 379 S.W.3d 248, 258 (Tex. 2012) (reviewing court

should consider "the entire court record, including pleadings, motions and

responses, and relevant ***evidence*** properly ***admitted***" to determine whether "the

---

[5] The clerk's record reflects KSADD, L.L.C. has appeared generally in this lawsuit without any challenge whatsoever to the trial court's jurisdiction over its person.  CR33-37.

[6] *See Director, State Employees Workers' Comp. Div. v. Evans*, 889 S.W.2d 266, 268 (Tex. 1994) ("Affidavits attached to the motion for new trial do not have to be offered into evidence in order to be considered by the trial court for the meritorious defense element . . . .  It is sufficient that the affidavits are attached to the motion for new trial . . .").

[7] *See* Tex. R. Civ. P. 166a(c), (f), (*i*).

[8] CR39 n.1, 40 nn.2-7, 41 n.10, 42, 44 nn.13-15, 45 nn.16-17, 48 n.22, 49 nn.23-26, 127 nn.1-5, 128 nn.6-11, 130 & n.16, 134 nn.17-21, 135 nn.22-23, 136 nn.24-28, 137 nn.29-30, 138 nn.32-34, 139 nn.35-36, 38-39, 140 n.40, nn.42-44, 141 nn.45-47, 142 nn.48-49, 143 nn.50-52, 145; RR6.

contact at issue was part of medical care, or health care, or safety or professional or administrative services directly related to health care") (emphases supplied).

The statement of "**<u>FACTS</u>**" in KSADD, L.L.C.'s opening brief relies almost entirely upon citations to affidavits (and additional hearsay documents) the Court can assume might be "relevant" but which were never "properly admitted" in the trial court. *Cf.* RR7 (after KSADD, L.L.C.'s counsel asserted "we've *shown* [*sic*] evidence of" all the *Ross* considerations, trial court stated: "your big picture position is that at the time she was injured, Ms. Williams was assisting in the providing of healthcare") (emphasis supplied); RR17-18 (trial court stating to KSADD, L.L.C.'s counsel: "again, *when <u>you</u> say* they're assisting in providing care . . .") (emphases supplied); RR44 (KSADD, L.L.C.'s counsel asserting "Plaintiff's counsel was testifying [*sic*] about" *Valley Regional Medical Center v. Camacho*, No. 13-14-00004-CV (Tex. App.--Corpus Christi May 14, 2015, no pet.) (mem. op.).[9]

---

[9] It is unclear why on page 12 of its opening brief KSADD, L.L.C. feels it necessary to repeatedly *insert* (and *italicize*) new bracketed verbiage not actually included in paragraphs 10 and 12 of the affidavit signed by KSADD, L.L.C.'s automatic door expert (even assuming, contrary to the clerk's and reporter's records, KSADD, L.L.C.'s automatic door expert's affidavit had actually been offered and admitted into evidence). *Cf.* Tex. R. Evid. 802 (only inadmissible hearsay actually "admitted" without objection cannot be denied probative value); Tex. R. Evid. 101(b) ("These rules apply to proceedings in Texas courts except as provided in subdivisions (d)-(f)"); Tex. R. Evid. 103(a)(2) (recognizing "a ruling" is needed "to admit or exclude" evidence, and an "offer of proof" would be needed if the ruling excludes evidence).

The record shows KSADD, L.L.C. did nothing more than file affidavits (and other documents) with its dismissal motion, and its later supplemental briefing. CR38-90, 126-179. Ms. Williams respectfully objects to KSADD, L.L.C.'s factual averments (on pages 6-13 of its opening brief) as factually unsupported and inappropriate to the extent they cite and rely upon affidavits and other hearsay documents KSADD, L.L.C. never offered (and the trial court never admitted) into evidence. Alternatively, if the Court were to decide affidavits and other documents KSADD, L.L.C. never introduced into evidence are properly considered in this appeal, then Ms. Williams asserts the following facts from her own timely filed affidavit are the correct facts this Court should consider instead.[10]

Ms. Williams recalled walking into the clinic located at 3865 Childress Avenue, Mesquite, Texas 75150 on June 20, 2013. CR112. This was the first time Ms. Williams had ever been to the clinic. *Id.* She was not a patient. *Id.* She was only there to pick up a friend who had finished treatment. *Id.* Ms. Williams had never been provided medical care at the facility. *Id.*

When Ms. Williams arrived at the facility, she entered through two sets of automatic doors. CR112, 116. From being present at the clinic and personally

---

[10] *See genenerally Texas & Pac. Ry. Co. v. Van Zandt*, 159 Tex. 178, 317 S.W.2d 528, 531 (1958) (rules "must be applied to plaintiffs and defendants alike"); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 439 (Tex. 1984) (4-judge dissent) ("There is no greater inequality than the unequal treatment by the same court of things that are equal"); U.S. Const. amend XIV, § 1 ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws").

observing the doors, Ms. Williams has personal knowledge that the photograph attached as Exhibit A behind her affidavit is a true and accurate image of the clinic's doors as they appeared on June 20, 2013. *Id.*

The doors malfunctioned and hit Ms. Williams on June 20, 2013. CR112. Ms. Williams's friend was in the clinic and Ms. Williams was waiting to give her a ride home. CR112-13. There were no doctors or employees present when the door hit Ms. Williams. CR113. There were no doctors or employees operating the door either. *Id.* There was a witness who was in the waiting room that saw the doors malfunction and hit Ms. Williams. *Id.*

When the door hit Ms. Williams, she was not inside the area of the clinic where patients are treated. CR113. She was not in the waiting room either. *Id.* The malfunctioning door that hit Ms. Williams was located in the entrance to the building, not in a place where patients were receiving care. *Id.*

The only reason Ms. Williams was on the clinic's premises that day was because she was picking up a friend. CR113. Ms. Williams was not, and had never been, a patient seeking medical care at the clinic, nor had she ever received medical care there at the clinic. *Id.* Ms. Williams's plan that day was to enter the clinic and wait to meet her friend and drive her home. *Id.*

Prior to her injury, Ms. Williams had never been contacted by any employee or owner of the clinic, nor had any employee or owner of the clinic mentioned

anything regarding the malfunctioning automatic doors to her. CR113. Ms. Williams was never told by any employee or owner of the clinic that she would be assisting in the medical treatment of her friend. *Id.*

Ms. Williams was not informed by the doctors of any special routine or procedures she needed to follow on behalf of her friend. CR113. Ms. Williams never even had communication with anyone at the clinic. *Id.* "I was there to drive her home, and that was it. I was not a caretaker for my friend- after I was to drop her off at her home, I was going to go back to my daily routine. I have no medical training, and did not receive any that day prior to picking up my friend. At no time did any employee or doctor at the clinic ask me to assist in providing health care to my friend." *Id.*

Ms. Williams's complaint regarding the malfunctioning automatic doors is centered on that very fact — the doors malfunctioned and hit her. CR113. "My complaint is that the doors malfunctioned and knocked me down, not that any doctor did anything wrong." *Id.*

"The doors that malfunctioned were common automatic doors." CR113. "I've seen these doors - or doors very similar to the doors that hit me - at grocery stores, shopping malls, banks, and other businesses around Mesquite, Texas." *Id.* "These doors did not have any markings on them that would indicate they were anything other than normal automatic doors." *Id.* "These doors did not have any

markings on them that would indicate that they were special doors unique to the health care facility." *Id.*[11]

"When the doors malfunctioned and hit me, there was no employee or owner of the clinic present at the doors, nor was there any employee or owner of the clinic present at the doors and taking action in order to ensure that the doors were operating properly and not malfunctioning." CR114.

### Joan Williams's Summary of Argument

The trial court got it right, correctly denying KSADD, L.L.C.'s motion to dismiss and also correctly ordering that chapter 74 does not apply. CR180. No physician or other health care provider touched, contacted, nor otherwise treated Ms. Williams; consequently, there is no applicable presumption that her premises

---

[11]  *Cf.* RR39-40 (Ms. Williams's counsel arguing:  "At no point does the defendant in [its] supplemental briefing argue that the doors in question were of a type used in providing healthcare. . . .  I'm just going to show [the Court] -- this is from the Stanley website.  This is a product listing of the door in question, Your Honor. . . .  [H]ere is a product listing of the doors that are not in question, and those are healthcare doors.  These are also made by Stanley, and those are healthcare doors.  And what I'm getting at is that KSADD could have chosen to buy and install healthcare specific doors, but they didn't.  They installed doors that you see at malls, grocery stores, Target, other places. . . .  [T]here's nothing special about these doors that makes them a door that is of a type used in healthcare").  Ms. Williams acknowledges that arguments by her counsel are not "evidence."  *See*, *e.g.*, *In re MetroPCS Commc'ns, Inc.*, 391 S.W.3d 329, 338 (Tex. App.--Dallas 2013, orig. pro.) ("Golovoy does not explain, and the record does not show, how argument by his counsel at the hearing constitutes 'evidence.'"); *McCain v. NME Hosps., Inc.*, 856 S.W.2d 751, 757 (Tex. App.--Dallas 1993, no writ) ("Motions and arguments of counsel are not evidence").  But Ms. Williams's counsel's arguments (based on Stanley's website) were not refuted by KSADD, L.L.C. (at *all*) during the June 1 recorded hearing.  And they are consistent with Ms. Williams's sworn affidavit testimony, which is in the clerk's record and which must be considered in this appeal *if* KSADD, L.L.C.'s un-offered, un-admitted affidavits (and other un-offered, un-admitted documents) are going to be accepted and considered by this Court.  *See* p. 13, n. 10, above.

liability claim is instead a health care liability liability claim. Ms. Williams acknowledges KSADD, L.L.C. was an "affiliate" (RR46), but KSADD, L.L.C. has never provided health care services, never held a medical license, and never put "hands on" nor "treat[ed]" a patient (RR48). Dispositively, KSADD, L.L.C. failed in its burden to introduce evidence proving Ms. Williams's premises liability claim has a substantive relationship to the provision of health care. Therefore, KSADD, L.L.C.'s appellate issue presented is without merit and should be summarily overruled.[12]

Independently, KSADD, L.L.C. has violated Texas procedural law by inappropriately appending behind its opening brief (and arguing for reversal based on) the Code of Federal Regulations, alleged guidelines from the Accreditation for Ambulatory Health Care, Inc. ("AAAHC"), an NFPA "Life Safety Code" provision, and hearsay correspondences that are *nowhere found* in the clerk's record or the reporter's record and which KSADD, L.L.C. chose not to present to the hard working trial court.

KSADD, L.L.C. never filed any counterclaim (nor requested attorneys' fees in its original answer) against Ms. Williams. *See* CR33-37; *see also* Tex. R. Civ P. 97(a) (entitled "**Compulsory Counterclaims**"). KSADD, L.L.C. repeatedly

---

[12] It is unclear why the "ISSUE PRESENTED" on page ii of KSADD, L.L.C.'s opening brief, (within its table of contents) includes half a dozen complete Texas Supreme Court citations (including S.W.3d citations and years of decision), while the "**ISSUE PRESENTED**" on page 5 of KSADD, L.L.C.'s opening brief gives only abbreviated case name references.

requested (both in its original motion to dismiss and in supplemental briefing) that Ms. Williams be ordered to pay attorneys' fees to KSADD, L.L.C. (and to the non-suited defendants as well) (CR52, 145); however, KSADD, L.L.C. chose not to repeat those requests in its opening brief to this Court. *See* appellant's opening br. at 17, 37-38; *id.* at i, 1 (no request for attorneys' fees expressly included) (and none of the non-suited appellants has joined KSADD, L.L.C.'s brief in this appeal).[13]

KSADD, L.L.C.'s (and the non-suited defendants') failure to repeat its/their trial court request(s) for attorneys' fees in KSADD, L.L.C.'s interlocutory appeal brief to this Court (1) appears to be deliberate, and (2) further demonstrates this appeal has been taken without sufficient cause and for purposes of delay.[14]

---

[13] *See generally PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 715 (Tex. App.--Dallas 2011, pet. denied) (trial court parties who choose not to file their own brief on appeal — nor join a complaining party's brief on appeal — receive no relief from this Court).

[14] *Cf. Archer v. Tunnell*, No. 05-15-00459-CV (Tex. App.--Dallas June 23, 2015, n.p.h.) (deferring ruling on appellee's motion for sanctions in cow/physician chapter 74 interlocutory appeal); RR47-48 (after KSADD, L.L.C.'s counsel volunteered his personal opinion this is a "frivolous" liability case, Ms. Williams's counsel appropriately responded: "I take exception to that. There can be frivolous defenses the same way there can be frivolous claims"). Ms. Williams has not filed a motion for sanctions against KSADD, L.L.C. and its counsel, even though Ms. Williams believes KSADD, L.L.C.'s interlocutory appeal is objectively frivolous (and believes this Court should so determine) in light of *Ross v. St. Luke's Episcopal Hospital. Cf. Dallas County v. Sides*, 430 S.W.3d 649, 651, 654 (Tex. App.--Dallas 2014, no pet.) (teaching this Court will not sanction an appellant unless the Court "conclude[s] the circumstances of this appeal were truly egregious"); Tex. R. App. P. 45 (empowering this Court to determine that an appeal is frivolous "on its own intiative" after considering documents "***in the record***" and "briefs" and "***other*** papers filed in the court of appeals") (emphases supplied).

**Joan Williams's Arguments and Authorities**

**I.    Ms. Williams's Claim is Not a Chapter 74 Health Care Liability Claim Subject to the Medical Expert Report Requirement**

The purpose of the Texas Medical Liability Act's expert report requirement is not to have claims dismissed regardless of their merits, but rather it is to identify and deter frivolous claims while not unduly restricting a claimant's rights. *Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011). The Legislature did not intend for the expert report requirement to apply to every claim for conduct that occurs in a health care context. *See Loasisiga v. Cerda*, 379 S.W.3d 248, 258 (Tex. 2012). Under the supreme court's more recent opinion in *Ross v. St. Luke's Episcopal Hospital*, 462 S.W.3d 496 (Tex. 2015), Ms. Williams's premises liability claim against KSADD, L.L.C. for injuries sustained (when she was hit by defendant's malfunctioning automatic door) is a claim for which the Legislature did not intend to require service of a medical expert report. In accordance with *Ross*, KSADD, L.L.C.'s motion to dismiss for lack of a medical expert report was correctly denied.

In *Ross*, the Supreme Court of Texas held that "for a safety standards-based claim to be a health care liability claim, there must be a substantive nexus between the safety standards allegedly violated and the provision of health care" and "that nexus must be more than a 'but for' relationship." 462 S.W.3d at 504. KSADD, L.L.C.'s position that Ms. Williams's claim is a health care liability claim (simply

-21-

because it concerns departures from accepted standards of safety) fails the test laid out by the supreme court in *Ross* for lack of a substantive nexus to the provision of health care. After *Ross*, in order to constitute a health care liability claim, the defendant must show that the safety standards at issue have a substantive nexus to the provision of healthcare. *See also id.* at 506 & n.2 (Lehrmann, J., concurring, joined by Devine, J.) ("The Court holds, and I agree, that a cause of action against a health care provider for a departure from safety standards is a health care liability claim only if it has a "substantive relationship" with the provision of medical or health care").[15]

Moreover, Ms. Williams's case is even further away from chapter 74 than the facts first presented *Valley Regional Med. Center v. Camacho*, No. 13-14-00004-CV (Tex. App.--Corpus Christi May 14, 2015, no pet.) (mem. op.). In *Camacho*, the automatic doors were "hooked up to an alarm called the Infant Abduction System," a system "designed to prevent the abduction of newborn babies from the nursery section of the hospital" that "causes the sliding doors to automatically close when it detects the presence of an ankle bracelet which is

---

[15] *Cf.* RR48-49 (trial court aptly observing: "remember the whole crisis was about how medical malpractice premiums had skyrocketed, and all the doctors needed this protection, and they -- and this particular claim wouldn't even be a -- it would be covered by typically an insurance policy that's just a general premises liability policy, not a medical malpractice insurance policy"); *Lucas v. United States*, 757 S.W.2d 687, 691 (Tex. 1988) (majority observing twentieth century leglislature found that a "medical malpractice insurance crisis" had been created and that "satisfactory insurance coverage . . . [was] often not available . . .").

secured to each infant." The doors in *Camacho* were activated by the proximity of sensors attached to each infant patient's ankle and would close the doors to prevent someone from leaving with or kidnapping an infant who was still a patient that had not been dismissed from the hospital. As such, the doors in *Camacho* were ***much more a part of*** ongoing medical treatment and ongoing medical security and safety in the women's center/newborn department at Valley Regional Medical Center.

In Ms. Williams's case, by stark contrast, there is no such indirect relationship to the provision of health care, much less a substantive nexus between the provision of health care and the malfunctioning main entrance doors as required under *Ross*. The doors that were the subject of KSADD, L.L.C.'s motion to dismiss are mere doors — main entrance doors, not security doors specially designed and engineered to react to the unauthorized movement of infant patients beyond a certain portion of the premises. The doors at issue in Ms. Williams's case are not uniquely designed for medical treatment or for medical facilities. CR102 & n.5, 119; RR39-40.

The doors at issue in this case were not prescribed to Ms. Williams nor were they prescribed by a doctor to the friend that Ms. Williams was visiting and picking up. CR103, 112-13. The doors at issue in this case can be found at grocery stores, shopping malls, banks, and almost any other variety of business premises one can imagine. CR103, 113

In *Ross*, our supreme court promulgated certain non-exclusive considerations for courts attempting to draw the line between a safety standards-based claim that is not an HCLC and one that is an HCLC:

> 1.     Did the alleged negligence of the defendant occur in the course of the defendant's performing tasks with the purpose of protecting patients from harm;
>
> 2.     Did the injuries occur in a place where patients might be during the time they were receiving care, so that the obligation of the provider to protect persons who require special, medical care was implicated;
>
> 3.     At the time of the injury was the claimant in the process of seeking or receiving health care;
>
> 4.     At the time of the injury was the claimant providing or assisting in providing health care;
>
> 5.     Is the alleged negligence based on safety standards arising from professional duties owed by the health care provider;
>
> 6.     If an instrumentality was involved in the defendant's alleged negligence, was it a type used in providing health care; or
>
> 7.     Did the alleged negligence occur in the course of the defendant's taking action or failing to take action necessary to comply with safety-related requirements set for health care providers by governmental or accrediting agencies?

*Ross v. St. Luke's Episcopal Hospital*, 462 S.W.3d 496, 505 (Tex. 2015).  On the record before this Court, the answer to each of these questions in Ms. Williams's case is "no" and the trial court's order should be summarily affirmed.

First, the record does not show that the automatic door malfunction occurred in the course of KSADD, L.L.C. performing any task at all, much less a task to

-24-

protect patients from harm. CR104. There were no doctors or employees present when the doors hit Ms. Williams. CR104, 113. There were no doctors or employees operating the doors, either. *Id.* There was a witness who was in the waiting room who saw the doors malfunction and hit Ms. Williams, and who will testify that (1) there were no doctors or employees of KSADD, L.L.C. present, and (2) the doors opened suddenly and without warning and without Ms. Williams pressing the activation plate that would normally open the doors. CR104. Ms. Williams was not a patient. CR104, 112.

Second, Ms. Williams was injured in the entrance to the facility. CR104, 113, 116. Ms. Williams was not in an area where patients might be during their treatment so that the obligation of the provider to protect persons who require special medical care was implicated. CR104-05. Ms. Williams was not in an area where patients were being treated, nor was she in the patient waiting room. *Id.*

Third, at the time of her injury Ms. Williams was not in the process of seeking or receiving health care. CR105. Again, Ms. Williams was not a patient. CR105. The only reason Ms. Williams was on the clinic's premises that day was because she was picking up a friend.. CR105, 113. She was not, and had never been, a patient seeking medical care at the premises, nor had she ever received medical care at the premises. *Id.*

Fourth, at the time of the injury Ms. Williams was not providing or assisting in providing health care. CR105. When she was injured by the malfunctioning door, Ms. Williams had never been contacted by any employee or owner of the clinic, nor had any employee or owner of the clinic mentioned anything regarding the automatic doors to her. CR105, 113. Ms. Williams was never told by any employee or owner of the clinic that she would be assisting in the medical treatment of her mend. *Id.*; *see also* RR49 (trial court stating: "There's no evidence in [*sic*] the motion that she knew that she was assuming these duties voluntarily"). Joan Williams has never been licensed to provide medical treatment and has no medical training whatsoever. CR105. At no time did any employee or doctor at the clinic ask Ms. Williams to assist in providing health care to Ms. Williams's friend. CR105.

Fifth, there is no evidence in the record that the negligence alleged by Ms. Williams is based on safety standards arising from professional duties owed by KSADD, L.L.C. as a health care provider. CR105.[16] Ms. Williams's claim regarding the malfunctioning automatic doors has always centered on that very fact — the doors on KSADD, L.L.C.'s premises malfunctioned and hit her. CR105, 113. Ms. Williams's complaint is and always has been that KSADD, L.L.C.'s

---

[16] *See* Tex. R. App. P. 34.1 ("The appellate record consists of the clerk's record and, if necessary to the appeal, the reporter's record").

automatic doors malfunctioned and knocked her down, not that any doctor or employee of the clinic did anything wrong or that her claim in any way is related to medical treatment or medical safety standards. CR105-06.

Sixth, the instrumentality alleged in KSADD, L.L.C.'s negligence is a door, not an instrumentality unique to the provision of health care. CR106. There is no evidence that the automatic doors were particularly suited to providing for the safety of patients. CR106, 119. Nor were the doors in question designed to provide for the safety of medical patients. *Id.* The doors in question were manufactured by Stanley Access Technologies, and are Automatic Swing Door Operator Systems, serial numbers A515400 (inner door) and A597485 (outer door). CR106. Stanley Access Technologies' website indicates that these doors are "beneficial for any commercial, retail, or industrial environment . . ." (*see* CR106 & n.18, citing to http://www.stanleyaccess.com/automatic-swing-door-operators), not that they are specially designed for the healthcare industry and setting. Additionally, Stanley Access Technologies does indeed manufacture automatic doors for Intensive Care Units, Hospitals, and Other Healthcare Facilities (*see* CR 106 & n.19, citing to http://www.stanleyaccess.com/manual-icu-ccu-doors). At no time has KSADD, L.L.C. alleged in response to Ms. Williams's numerous discovery requests that the doors that injured Ms. Williams were the specialized healthcare facility doors marketed by Stanley Access Technologies,

because they simply were not.  CR106.  Instead, the entrance doors at KSADD, L.L.C.'s premises at 3865 Childress Avenue in Mesquite, Texas, are normal doors not specialized to the healthcare industry.  CR106.

Nor does the record demonstrate that the automatic doors were installed to comply with a safety-related requirement set for health care providers by a governmental or accrediting authority.  CR106.  To this point, in its motion to dismiss, KSADD, L.L.C. cited Tex. Admin. Code § l35.10(b), a regulation pertaining to Ambulatory Surgical Centers, which does *not* require a defendant to install automatic doors.  CR106-07.  The language in regulation 135.10(b) simply states that "hazards that might lead to slipping, falling, electrical shock, bums, poisoning, or other trauma shall be eliminated."  25 Tex. Admin. Code § 135.10(b).  CR107.  KSADD, L.L.C. has not provided, and there does not exist, any safety-related requirement for health care providers to furnish automatic doors on behalf of their patients.  CR107.

Finally, for the same reasons addressed in the previous paragraph, the record contains no evidence that the negligence alleged by Ms. Williams regarding the malfunctioning automatic doors occurred in the course of KSADD, L.L.C. taking action or failing to take action necessary to comply with safety-related requirements set for health care providers by governmental or accrediting agencies.  CR107, 112-14.  (New appellate arguments at, *e.g.*, pages 22-28 of KSADD,

L.L.C.'s opening brief, and new appendix items appended to that brief, are dehors the record and should be ordered stricken in this Court's opinion in fairness to the trial court and to discourage would-be interlocutory appellants from attempting to appeal on a different record than they presented to the trial court.)

Considering all seven factors set forth in *Ross*, and the evidence (if *any*) properly admitted below, Ms. Williams's claim alleges a departure from standards of safety that do *not* have a "substantive relationship with the providing of medical or health care." *Ross v. St. Luke's Episcopal Hospital*, 462 S.W.3d 496, 504 (Tex. 2015). Accordingly, Ms. Williams's claim is not a health care liability claim, KSADD, L.L.C.'s issue presented is without merit, and the trial court's order denying KSADD, L.L.C.'s motion to dismiss should be summarily affirmed.

## II. There Was and Is No "Presumption" that Ms. Williams's Premises Liability Claim Was Instead a Health Care Liability Claim

In both its written and oral advocacy below (but not in this Court), KSADD, L.L.C. repeatedly (and erroneously) argued (1) there is a "presumption" that chapter 74 governs Ms. Williams's premises liability claim, (2) KSADD, L.L.C. should enjoy the *benefit* of that alleged presumption, and (3) Ms. Williams had not met her alleged burden to *rebut* KSADD, L.L.C.'s alleged presumption. CR145; RR6-7, 19-20, 27. Early in its June 1 oral arguments to the trial court, KSADD, L.L.C. erroneously asserted:

We believe that this is a healthcare liability claim. And ***this is really the key presumption in this case***. It's from this -- and I'm going to mess this name up -- it's *Loaisiga*, L-O-A-I-S-I-G-A, versus Cerda. And this -- the key phrase from this case is -- the breadth of the statute's text essentially creates a presumption that a claim is a healthcare liability claim if it is a claim against a physician or healthcare provider and is based on facts implicating the defendant's conduct during the course of a patient's care, treatment or confinement.

*  *  *

This presumption -- this healthcare presumption, because it's during a patient's care, ***has not been rebutted*** under the new *Ross* case . . . . So our argument is that we've shown [*sic*] evidence of all six of the *Ross* considerations . . . .

RR6-7 (emphases supplied).

KSADD, L.L.C.'s ***appellate*** brief ***nowhere*** repeats these erroneous presumption / failure-to-rebut arguments, which were and remain without merit as a matter of law. The *Loaisiga* case involved a physician allegedly groping female patients' breasts "while examining them for sinus and flu symptoms." *Loaisiga v. Cerda*, 379 S.W.3d 248, 252 (Tex. 2012). As every person who sees a doctor understands, physicians often have to touch sensitive parts of patients' bodies in order to chase down and diagnose medical complaints. Such touching may be inappropriate, or it may be appropriate but misinterpreted, so (in fairness to physicians) a presumption that "inappropriate touching" claims against a physician are health care liability claims arguably makes some sense. *See id.* ("We hold that the TMLA creates a rebuttable presumption that a patient's claims against a

physician or health care provider based on facts implicating the defendant's conduct during the patient's care, treatment, or confinement are HCLCs").[17]

The reason KSADD, L.L.C. deliberately waived its "presumption" / failure-to-rebut argument in this Court is that KSADD, L.L.C.: is (in its counsel's own words) a "landlord entity" (RR45); is not a physician; never physically examined Ms. Williams (or Ms. Williams's friend); never touched, groped or examined Ms. Williams (or Ms. Williams's friend); and (for anything this record shows) never exercised any kind of medical judgment in failing to maintain or repair the ordinary Stanley automatic doors that malfunctioned and injured Ms. Williams.

## Conclusion and Prayer for Relief

Ms. Williams requests that KSADD, L.L.C.'s issue presented be summarily overruled, that the interlocutory order appealed from be summarily affirmed, that costs of this interlocutory appeal be taxed against KSADD, L.L.C.

---

[17] A similar presumption may benefit non-physician health care providers sued by patients. *Cf. Harris Methodist Fort Worth v. Ollie*, 342 S.W.3d 525, 527 (Tex. 2011) (per curiam) ("the essence of [patient's] claim centers on the failure of Harris Methodist to act with a proper degree of care to furnish a dry floor, warn her of the hazards of a wet bathroom floor, or some similar failure to act"); *Garland Community Hosp. v. Rose*, 156 S.W.3d 541, 545-46 (Tex. 2004) ("[T]he Hospital's credentialing activities are an inseparable part of the medical services Rose received. One of a hospital's primary functions is to provide a place in which doctors dispense health care services. The quality of a health care provider's medical staff is intimately connected with patient care. A hospital's credentialing of doctors is necessary to that core function and is, therefore, an inseparable part of the health care rendered to patients. . . . When a plaintiff's credentialing complaint centers on the quality of the doctor's treatment, as it does here, the hospital's alleged acts or omissions in credentialing are inextricably intertwined with the patient's medical treatment and the hospital's provision of health care").

In order to prevent KSADD, L.L.C. from receiving further unwarranted delay of a jury trial (CR191), Ms. Williams requests that this Court order that no motion for rehearing may be filed in this Court pursuant to its authority under Tex. R. App. P. 2 and 49.9. *Cf. Davis v. City of Robinson*, 919 S.W.2d 849, 852 (Tex. App.--Austin 1996, writ denied) (per curiam) (refusing to deny appellants' right to file their motion for rehearing because before 1997 a motion for rehearing in the appellate court was still "a procedural jurisdictional prerequisite to filing an application for writ of error to the Supreme Court of Texas").

Ms. Williams also requests all other appropriate relief to which she may be entitled on the record that is (and is not) properly before this Court, including a determination pursuant to Tex. R. App. P. 45 that KSADD, L.L.C.'s interlocutory appeal is frivolous.

Dated:  **October 23, 2015**     Respectfully submitted,

TED B. LYON & ASSOCIATES, P.C.


_Ben Taylor_

John Hallman (24092474)
Marquette Wolf (00797685)
Ben Taylor (19684500) ) [btaylor@tedlyon.com]
18601 LBJ Freeway, Suite 525
Mesquite, Texas 75150-5632
Telephone:  (972) 279-6571
Facsimile:  (972) 279-3021

Counsel for the Appellee,
Joan Williams

## Certificate of Word Count Compliance

Relying on the word count function in the word processing software used to produce this document, I certify that the number of words in this brief (*excluding* any caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix) is **5,618**.

_____
Ben Taylor

## Certificate of Filing and Service

I hereby certify that on the **23rd day of October, 2015**, this brief (with appended June 1, 2015 reporter's record) has been e-filed today with the Clerk of the Fifth Court of Appeals; also, a copy has also been sent today, **October 23, 2015**, by e-mail to counsel and by first-class United States Mail, postage prepaid, to the presiding trial judge in the trial court, properly posted and addressed per below:

Russell G. Thornton [rthornton@trtblaw.com]
R. Gregg Byrd [gbyrd@trtblaw.com]
THIEBAUD REMINGTON THORNTON BAILEY LLP
Two Energy Square
4849 Greenville Avenue, Suite 1150
Dallas, Texas 75206

   (counsel for the appellant, **KSADD, L.L.C.**)

Hon. Ken Tapscott, Judge
Dallas County Court-at-Law No. 4
George L. Allen, Sr. Courts Bldg.
600 Commerce St. # 575
Dallas, Texas 75202

   (courtesy copy)

_____
Ben Taylor

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. CC-14-03455-D
COURT OF APPEALS NO. 05-15-00776-CV

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
7/28/2015 8:36:14 AM
LISA MATZ
Clerk

| | | |
|---|---|---|
| JOAN WILLIAMS, | § | IN THE COUNTY COURT |
| PLAINTIFF, | § | |
| VS. | § | AT LAW NO. 4 |
| NAGARAJ KIKKERI, M.D., KIKKERI INTERNATIONAL, P.A., d/b/a ADVANCED PAIN SOLUTIONS, NORTH TEXAS TEAM CARE SURGERY CENTER, L.L.C., and KSADD, L.L.C., | § | |
| DEFENDANTS. | § | DALLAS COUNTY, TEXAS |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEFENDANTS' MOTION TO DISMISS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

On the 1st day of June, 2015, the following proceedings came on to be heard in the above-entitled and -numbered cause before the Honorable Ken Tapscott, Judge presiding, held in Dallas, Texas;

Proceedings reported by computerized-machine shorthand.

A P P E A R A N C E S

**Mr. Marquette William Wolf**
SBOT NO. 00797685
**Mr. John Andrew Hallman**
SBOT NO. 24092474
TED B. LYON & ASSOCIATES
18601 LBJ Freeway, Suite 525
Mesquite, Texas  75150
Telephone: (972) 279-6571
Facsimile: (972) 279-3021
Mwolf@tedlyon.com

          ATTORNEYS FOR PLAINTIFF


**Mr. R. Gregg Byrd**
SBOT NO. 90001675
THIEBAUD REMINGTON THORNTON BAILEY LLP
4849 Greenville Avenue, Suite 1150
Dallas, Texas  75206
Telephone: (214) 954-2237
Facsimile: (214) 754-0999
Gbyrd@trtblaw.com

          ATTORNEY FOR DEFENDANTS

I N D E X

VOLUME 1

(DEFENDANTS' MOTION TO DISMISS)

June 1, 2015

|                                        | Page | Vol. |
|----------------------------------------|------|------|
| Appearances.............................. | 2 | 1 |
| Proceedings.............................. | 4 | 1 |
| Defendants' Motion to Dismiss............. | 4 | 1 |
| Plaintiff's Response...................... | 27 | 1 |
| Court's Ruling........................... | 50 | 1 |
| Court Reporter's Certificate............... | 58 | 1 |

P R O C E E D I N G S

THE COURT: We're on the record in the case of Joan Williams versus Nagaraj Kikkeri, K-I-K-K-E-R-I, M.D., et al., Cause Number CC-14-03455-D.

Counsel, note appearances for the record, please.

MR. WOLF: Marquette Wolf and John Hallman on behalf of plaintiff.

THE COURT: Okay.

MR. BYRD: Greg Byrd on behalf of all the defendants.

THE COURT: All right. We're here today on Defendants' motion to dismiss.

Go ahead.

MR. BYRD: Your Honor, as a brief summary for this hearing -- I understand that you're probably very familiar with this case law -- this case involves a former patient of Dr. Kikkeri that agreed to be a responsible adult, a ride home for one of her friends. And she had the same situation, I think it was, back in 2007, where she was one -- she had surgery, and she also had to get a ride home from a responsible adult. Two minutes, she arrives at the facility, is walking in the door, and as far as we can trace it back to the exact time line based on the EMS records and the PACU records,

her friend exits the PACU unit. Two minutes later she has a collision with the door. We believe that this is a healthcare liability claim.

THE COURT: Can I ask --

MR. BYRD: Yes, sir.

THE COURT: Now, this may have some importance, it may not, from your perspective, but was she actually -- had she made it into the facility to pick up her friend, Ms. Williams? Had she actually -- so the -- as I understand the facts, the first set of doors are manual doors, the second set of doors, these are the automatic open and close type doors, right?

MR. BYRD: There is a hallway and a breezeway, so to speak. Both doors are automatic.

THE COURT: Oh, both doors are automatic. I thought one set was manual.

MR. BYRD: Well, that's -- that was in her pleading, but that's not --

THE COURT: Okay. All right. So there's a second set of doors, and she -- when she was hit by the door, was she actually helping her friend at that particular time exit the facility, or was she going in to get her friend?

MR. BYRD: My understanding, she was going in to get her friend, and the surgery had been planned

in reliance on her friend having a ride home.

THE COURT: Right. Yeah. They didn't want the person to drive home after having anesthesia administered and -- right.

MR. BYRD: And they also want someone that just hadn't recently had anesthesia to receive all the instructions.

THE COURT: Okay. All right. Go ahead.

MR. BYRD: Yes, Your Honor.

We believe that this is a healthcare liability claim. And this is really the key presumption in this case. It's from this -- and I'm going to mess this name up -- it's *Loaisiga*, L-O-A-I-S-I-G-A, *versus Cerda*. And this -- the key phrase from this case is -- the breadth of the statute's text essentially creates a presumption that a claim is a healthcare liability claim if it is a claim against a physician or healthcare provider and is based on facts implicating the defendant's conduct during the course of a patient's care, treatment or confinement.

And that's what we have in this case. Her friend had just left the PACU and was going into her holding area where she's monitored and she needs to rest and receives any additional care as necessary.

This presumption -- this healthcare

presumption, because it's during a patient's care, has not been rebutted under the new *Ross* case, which has -- the *Ross* case lined out six -- or actually seven factors. My opinion is that there's actually six factors because two of them are alteratives. Either you're seeking or receiving care or you're assisting and providing it. I don't see how you can provide both.

So our argument is that we've shown evidence of all six of the *Ross* considerations from that case. And again, because we believe that this is still a healthcare liability claim in line with *Ross*, I'd request dismissal with prejudice. That's kind of the summary of our argument. I was going to go through the elements next, or I can go through the recent case law, whatever would be your preference.

THE COURT: Well, you argue it however you want, if you want to go through the elements. But your position is that she was -- essentially, your big picture position is that at the time she was injured, Ms. Williams was assisting in the providing of healthcare.

MR. BYRD: Yes.

THE COURT: That's the big picture?

MR. BYRD: Yes, Your Honor.

THE COURT: Because she was there as a

responsible adult who helped a patient who had just been operated on actually leave the facility in a, I guess, responsible way and not being informed -- having -- not being able to drive machinery after having anesthesia administered, and also making sure that she left the hospital with the appropriate postsurgical instructions, meaning left with somebody who had just not had anesthesia administered to them.

MR. BYRD:  Yes, Your Honor.

THE COURT:  Okay.  All right.  So, now go ahead.  I guess if you want to go through the facts, you can.  But that's the big picture, Ms. Williams was assisting in providing healthcare.

MR. BYRD:  She was.  And this surgery -- if her name -- if her friend did not have a name in the medical record identifying a specific, responsible adult, the surgery would not have been performed.  We cannot release anyone postoperatively without a responsible adult.  And so this surgery was performed in reliance on her being there.  And as we see, when she was not able to fulfill her duties, she had to be replaced not by a visitor, such as the plaintiff in *Ross*; she was replaced by an employee of the facility to help get out of the facility in a wheelchair.

So that just shows that this -- this is not

a *Ross*-type case. It doesn't involve a visitor. It's -- and actually, this factor, her participation in the healthcare, distinguishes it from the other cases that follow this. And I'll go into that.

THE COURT: Also, that Corpus Christi case that they cited, is that also --

MR. BYRD: Well, let me see. And let me go through those cases real quick.

THE COURT: Well, I think it's the *Camacho* case.

MR. BYRD: Yes. There's *Camacho* 1 and *Camacho* 2. *Camacho* 1 was the one that we initially cited. And that one came out before *Ross*, and it was the door -- the automatic door case, the baby theft prevention doors. *Camacho* 1 is now, in fact, under *Ross*. It's no longer good law. And then, now we have *Camacho* 2, which came out after *Ross*.

In the *Camacho* 2 case -- let me see my briefing on that. There's basically two things, and that's -- two things we can get from this *Camacho* 2 case, which is in our binder. It is Tab Number 22. The first thing, the first key holding in *Camacho* 2 was that -- the first element of *Ross*, that the alleged negligence occurred in the course of the defendant's performing tasks to protect patients from harm. That

alone, that alone is not enough according to the *Camacho* case, according to the *Camacho* court. It's got to be something else.

In Section 10 of this case, they say: Arguably, VRMC's -- that's the hospital -- alleged negligence occurred in the course of its performance of tasks with the purpose of protecting patients, i.e., mothers, infants -- newborn infants, from harm.

However -- and this is where the -- this is where we find out it's not enough:

However, consideration of the remaining *Ross* factors militates against a finding that her claim has a substantive relationship with the providing of medical or health care.

Okay. So one isn't enough.

THE COURT: Do you realize where you're headed? It's kind of like if she comes in there -- and this is why -- and I'm going to follow the law here, but this is -- ultimately, it leads to the absurdity that if you're walking in to visit the patient and you slip and fall, it's a straight-up premises liability claim. If you're walking in to push them out in a wheelchair, as the responsible adult, and maybe at the same time visiting them, then it's a healthcare liability claim.

I mean, that's -- wow. And you know what's

interesting too is that this person who is assisting as the responsible adult -- obviously, just removing this -- let's say that this person could actually be qualified to render a medical opinion, like a nurse or a doctor, that -- but let's just say it's just your average Joe responsible adult. That person would never be qualified to provide medical care, give an opinion on medical care. I just -- I -- but it's really -- the Supreme Court has done this to itself, and -- but it really does lead to some absurd results.

You're there one day before. If you come to visit me the day before you slip and fall, it's a premises liability case; it's not a -- it's not a Chapter 74 case. But you come there the next day to actually help get me home, as the responsible adult, and you slip and fall or you have a door close in on you, now you need an expert report to hold the institution -- it leads to absurd results.

MR. BYRD: You know, I was thinking about that. Where does it stop? Where does it stop? And this is where it stops. It stops where the policies and procedures and the statutes stop, basically, where this Texas Administrative Code stops. If that's not covered by it, if the policy and procedure is not covered by it, that's where it stops.

Here we have two -- two guidelines: We have the Texas Administrative Code. We also have the policies and procedures. And as far as assisting, postoperative discharge instructions are very important. I've done medical malpractice for several years. There are cases where miscommunication regarding -- and this comes up a lot in a postoperative infection context. Miscommunication or alleged miscommunication regarding postoperative instructions, they can cause a lot of problems.

THE COURT: I understand all that's important to rendering good medical care. I mean, I just had a C5-C6 fusion myself March 5th, this nice little cut here on my neck, so --

MR. BYRD: Wow.

THE COURT: When I woke up, I wasn't exactly on planet Earth, so to speak, there for a little while, and so I know what you're talking about. People have got to be there. They've got to know what's appropriate after you get home after you get out of the hospital. I'm not diminishing that at all.

MR. BYRD: Yes, Your Honor.

THE COURT: I'm just saying, Gosh, the day before, you're a licensee, you're just -- you come in to visit a friend, and you just happen to be the person

also who's going to be the responsible adult. So the moment you come in to visit and you slip and fall or you get smacked by the door, straight-up premise liability claim, not a Chapter 74 claim. You show up the next day to pick them up and you slip and fall and you get smacked by the door or some other type of premises liability, premises defect, whatever, and all of a sudden, you need an expert report.

And that's really -- I know that's your position, is that, hey, look, big picture, she is assisting in the providing of healthcare by being a responsible adult.

MR. BYRD: Yes, Your Honor.

THE COURT: That's it.

MR. BYRD: I understand. And there's -- and that's well spoken from the plaintiff's perspective.

THE COURT: Well, it's really just -- I'm talking about just in general, aside from --

MR. BYRD: I understand.

THE COURT: You know, one day you're walking in, it's a straight-up premises liability case. The next day you're walking in, unbeknownst to you, and all of a sudden you are -- you are now assisting in healthcare, even though we would all agree that the vast majority of people who are acting in that capacity,

they're not medical experts, they can't render any type of healthcare appropriately in the sense of being qualified to treat someone, diagnose someone. They're just there basically to take down some -- I mean, collect the written instructions from the doctor, maybe take down some oral instructions, and then basically be a ride home.

MR. BYRD: I understand.

THE COURT: Now, if that's it in a nutshell --

MR. BYRD: I understand.

THE COURT: -- if that's it in a nutshell, and now they have to have an expert report -- and I know I'm just bashing on the policy of it all. And I'm not bashing you. It just seems to me that they have done this to themselves. They have created this problem where one day you don't need an expert report, the next day you need one.

MR. BYRD: Yes, Your Honor. And this --

THE COURT: I hear you. Yeah.

MR. BYRD: Well spoken, well taken.

THE COURT: All right. Go ahead.

MR. BYRD: Just brief follow-up to those comments. These are statutes our defendants have to follow. So imagine they're discharging patients without

a responsible adult. Imagine they leave that door in the condition described by plaintiff, smacking people, smacking plaintiffs, smacking the patients on the way out three times, her friend in a wheelchair. Violation of the statute? Of course.

Of course it's a statute violation. Which means from the defendants' point, we've got these rules, we've got to follow these rules, and now you're telling us these rules, we follow them, that's not healthcare? That's the flip side to this. If these rules are important, if it's important for them to follow them, it's healthcare.

THE COURT: You know, again, I read that these -- somewhere in the pleadings that allegedly these doors had been -- and I may -- I'm sorry if I'm mischaracterizing the evidence -- that they had been malfunctioning for -- is it three days or three hours or something along those lines, that they hadn't been working properly for some period of time, allegedly?

MR. BYRD: Yes, Your Honor.

THE COURT: Okay. So five minutes before this lady gets knocked down, somebody is in there to visit, and, bam, they get knocked down, and they get injured. They file a lawsuit against the facility, and they don't need any kind -- they're just there to visit

mom, dad, grandma, grandpa, say hi, see if you're okay, and then they get a kiss from a door.

So then, the next person walks in five minutes later who's a responsible adult, who's there to pick somebody up and maybe, at the same time, see their friend. They just agreed to be the person to give their friend a ride home and to get these instructions. And now they get knocked down, they get a kiss from the door, they slip and fall, and now they need an expert report about the lack of safety in the facility in the rendering of healthcare because they're assisting in providing healthcare.

Oh, my God. It's just -- it just -- we are treating basically the same people -- the same types of -- the same types of injury in two different ways, depending on why they walked in the door. And it's just like -- and I know you tell me this is a policy, too, that if somebody's there for -- if you're there to visit me, and I'm in the hospital, and you slip and fall and bust your head, no, that's not a healthcare liability claim. But if I walk out the door where I'm being treated, I'm there postoperative, they want you to walk it off and to walk around, try to get your blood flowing again, everything else -- because they had me up within a certain number of hours, they wanted me to walk around

the hospital -- if I walk out, and there's a pool of water and I slip and fall and I bust my head open, it's a healthcare liability claim. But if you're there to visit me and you do the same thing five minutes earlier and you fall and bust your head open, it's not a healthcare liability claim.

It just leads to absurd results, but I -- but go ahead. Go through the seven things here. And I don't want you to -- I don't want you to feel like I'm not receptive to your argument. It just needs -- it's frustrating from a judicial view because it doesn't seem, to me, to lead to any type of just result.

They're just -- you're treating -- I mean, the injuries could be five minutes apart, literally. It could be five minutes apart. One person whose walking in to visit, I'm treated differently than the person who basically is going to be there 15 minutes more only because they have to receive written and oral instructions from the treater before they walk the person out.

You know, the first person's coming in to visit, they slip and fall, they get bust -- they're just -- they're treated differently than the person who walks in five minutes later. And there's very, very little difference between the two, as far as -- again,

when you say they're assisting in providing care, it is -- it's important what they do, but I'm just -- I struggle with this idea that they should be treated differently than the person who walked in five minutes earlier as a visitor to see someone who was injured. I just -- one requires an expert report, one doesn't.

MR. BYRD: I understand, Your Honor.

THE COURT: And it just doesn't make a lot of sense to me. But then again, I know your argument is essentially, well, it's just the way the law's been interpreted by the appellate courts. And maybe one of these days they'll look at this, and they'll say, You know what, this is absurd. It really is absurd. It's -- but maybe they -- maybe they won't. But go ahead. So go ahead and make your argument on the seven.

MR. BYRD: Yes, Your Honor.

Since we're on substantive case law -- we started with *Camacho* 2 -- the second thing about *Camacho* 2 is the first element alone -- it's for the performance of tasks, for the purpose of protecting patients, that alone is not enough.

Then we get down to the doors. If the purpose of the doors is to prevent criminal misconduct, according to the *Camacho* case, *Camacho* 2, that's not healthcare. And *Camacho*, our position is it's not

applicable to this case because, number one, all they have is evidence of one factor. And number two, their door was designed to prevent criminal conduct. And there's been no evidence in the record that our door was designed for criminal conduct.

The next case we have that --

THE COURT: Isn't the most important part about *Camacho* that favors you is the fact that the person that was injured there -- and the reason this case is distinguishable, this case that's in front of me now, the *Williams* case, and *Camacho*, is the fact that *Camacho* is a visitor, straight-up visitor that is visiting a family member at the women's center at VRMC? She was there not to act as a responsible adult -- or he was -- no, she -- Maria Camacho was there to walk in as a visitor.

MR. BYRD: And that's --

THE COURT: Isn't that the key point?

MR. BYRD: That is key. That is key.

THE COURT: I mean, isn't that the key?

MR. BYRD: I think that is the presumption. They didn't have the benefit of the presumption in that case, which you just summarized *Tran* and *Rodriguez*. In neither of those cases did the presumption apply because Tran was an employee that fell on the floor in a break

room, and the 14th Court of Appeals said there's no elements. And none of the six *Ross* considerations, there's no evidence of any of those. And again, as you pointed out, not there to seek, to receive, to provide or to assist in healthcare.

*Rodriguez*, the same issue, we have a technician fixing that elevator -- no. Let me see. It was a -- well, it was -- I think they were maybe cleaning, and they got hurt in an elevator. But anyway, concept is he wasn't a patient, wasn't someone that was seeking, receiving, providing or assisting in healthcare, didn't have the benefit of the presumption. The Court also found there's none of the seven elements of the *Ross* case in that, no evidence of those.

That is really the extent of the case law as of May 28th. I checked this morning, and we got you the *Rodriguez* case as quickly as possible. To go through briefly, touch on the seven elements, I'll just briefly go through them, the seven *Ross* elements.

First element: The negligence occurred in the course of the defendant performing a task with the purpose of protecting the patient from harm.

The reason why we have responsible adults is to protect them, make sure they get someone that understands the discharge instructions, make sure they

get out the door in a wheelchair and home by someone that's not suffering from surgery and anesthesia.

We have the duty to maintain this door because in order to remove hazards -- and you mentioned you had spinal surgery. I've had four knee surgeries. I've been on crutches and canes, and I can tell you, it sure is nice when you have an automatic door because when there's not an automatic door, you've got to swing it open, crutch, crutch, crutch through, turn, in a sprint, turn, hoping the door doesn't swing back and hit you and knock you off the crutches.

THE COURT: Sure. I've had four as well. It's a -- it's a -- it's a tattoo contest.

MR. BYRD: It really is.

THE COURT: I understand. I agree with you, man. I agree. It's very difficult to use crutches if you don't have the door swing open for you. I agree totally.

MR. BYRD: And element number two: Did injuries occur in a place where the patient might be while they're receiving care?

Yes, while they were being wheeled -- discharged, and we talked about how the plaintiff's friend was also smacked by the same door. Obviously a place where patients received care, i.e., discharge,

supervision by a responsible person.

At the time of the injury, was the claimant seeking or receiving healthcare?

No. This is the part where I mentioned that two of the six -- two of the seven elements were interchangeable; you're either seeking or receiving healthcare or you're assisting or providing. I don't see how you can do both. So this third element is really not applicable.

Four: At the time of the injury, was claimant providing or receiving healthcare?

We've already discussed that.

Fifth was: Alleged negligence based on safety standards from professional duties owed by healthcare provider.

So this is -- this is yes. We have two sets of -- we have the discharge policies from the facility itself, and we have the Texas Administrative Code. Those are all safety standards imposing professional duties on KSADD and -- well, on North Texas Team Care Surgery Center, which is the -- let me back up.

In this case, as far as the defendants, we have the physician, Dr. Kikkeri. And then he has an office practice on one side of the building for pain

management. He's a pain management specialist. On the other side of the building, he has a surgery center, ambulatory surgery center, that they share a common reception area. He has an entity for each. He has -- he's the doctor. He has an entity for the office practice; that's APS. He has an entity for the surgery center; that's the North Texas Team Care Surgery Center, NTTC SC. And then he has KSADD, which is the landlord entity.

North Texas, in this case, because we have a postoperative patient, KSADD's duties are delegated to North Texas -- excuse me. The surgery center's duties are delegated to KSADD. KSADD, under the case law, under the statute, is an affiliate of Dr. Kikkeri. It's an entity that he has control over, and it's been delegated the responsibility of maintaining the premises as appropriate for an office practice or a -- maintaining the facility and the fixtures as appropriate for an office practice and a surgery center.

That is element number five briefed well in the motion that we filed.

An instrumentality involved and alleged in -- okay. And this is element six: If an instrumentality is involved in the defendant's alleged negligence, was it a type used in providing healthcare?

Now, this is something we provide in an expert report. We designated experts in the case according to our scheduling order. The expert we designated worked on these doors, and he, under oath, said that the way these doors are set up, open up, swing out, they have -- swinging away from the patients going -- leaving the facility with their responsible adults in wheelchairs. We have -- the only way to open them is by pushing them, so it's a knowing act. Presumably, a reasonable, prudent person in a surgery center would be a little bit more careful and -- when they're making that knowing act and push the push pad to open the door the only way it opens.

We also have to protect people on the other side in case someone is not using their best judgment, and we have a BEA Bodyguard Presence detector, which means if you're in the swing radius of the door, it's not supposed to open it. It automatically will not open.

He said that that kind of combination, that configuration, that modification of the door was a reasonable and prudent way to provide easy access and free-of-harm exit for these patients and their responsible adults. And he's also said -- and this is the part that I thought was really interesting -- he's

seen that same kind of configuration used on hospitals and ambulatory surgical centers throughout the DFW Metroplex. Likewise, he said that same setup is a reasonable, prudent way to provide entrance to patients.

As we noted in our briefing, a lot of these patients are like us, they're on wheelchairs, they're on canes, they have crutches, need some kind of assistance in walking, mainly due to their debilitating pain and the medications they received for the pain.

Our position is these doors were -- as configured, we have the figures we just discussed and also labeled. They were labeled to make it obvious that they were automatic doors. The function and the labeling of these doors was particularly suited to providing safety for the patients, as intended.

We're at the last element: Did the negligence occur in the course of the defense making or taking actions or failing to take action -- excuse me.

THE COURT: You need some water?

MR. BYRD: I brought some. Thank you.

THE COURT: Oh, okay. I was going to say, there's some right there.

MR. BYRD: Oh. That would be quicker.

THE COURT: I put cups there. You might want to snap that in place. Snap it in, if it does.

MR. BYRD: Okay.

THE COURT: I don't know if it does or not. I just don't want you to get it all over your suit.

Have you ever seen the movie "Airplane"?

MR. BYRD: I have.

THE COURT: I have a drinking problem? Whenever -- okay. Never mind. All right. Didn't want you to wear your water there.

Okay. Go ahead. I digress often.

MR. BYRD: I appreciate it. Thank you.

Okay. Back to this element number seven: Did it occur in the course of the defendant taking action or failing to take action necessary to comply with the safety-related requirements set for healthcare providers by governmental or accrediting agencies?

We've already discussed the two statutes. Texas Administrative Code 135.11 -- excuse me -- 135.11(18), that's the one that requires responsible adults in order to dismiss patients.

Texas Administrative Code 135.10, which says basically you have to remove all hazards.

Sorry.

THE COURT: That's fine. Go ahead.

MR. BYRD: Thank you, Your Honor.

Okay. And these are the kind of hazards we

have. And it uses a pronoun, hazards. Shock -- Any kind of hazard that might lead to slipping, falling, electrical shock, burning, poisoning or other trauma shall be eliminated.

We discussed how those doors were designed to prevent problems with getting out the door by a swinging door that could knock you off balance if you don't scoot through the doorway fast enough.

To summarize and give Plaintiff's counsel a chance to speak, the *Ross* case refined and narrowed the safety standards claim under the -- under Chapter 74 of the Civil Practice and Remedies Code. We have the presumption in this case because Ms. -- the plaintiff was participating in -- or assisting in providing healthcare at the time of her accident with the door. Under *Ross* and with this presumption, this is still a healthcare liability claim, an expert report was not timely served; and therefore, a dismissal with prejudice is required.

THE COURT: Okay. Thank you.

All right. Response.

MR. HALLMAN: Good afternoon, Your Honor. John Hallman for the plaintiff. Just want to say first off, if I seem a little bit nervous, it's not because I'm not confident in my argument. This is my first time

arguing a motion to dismiss.

THE COURT: Okay. Well, we're friendly here.

MR. HALLMAN: All right. That's what I'm kind of getting a feel for.

THE COURT: All right. Go ahead.

MR. HALLMAN: I want to clarify the facts to begin with. My client, Joan Williams, she was there with her friend. They went in together, and her friend was told that the procedure would take 45 minutes. Prior to that, the plan was that Joan was going to drop off her friend, go home to her husband, wait for a call and then come back. In response to 45 minutes wait time, Joan decided just to stay there. She stepped outside to the parking lot, called her husband to let him know that she would not be home as planned, that she was just going to stay there, and got off the phone and stepped back into the healthcare facility. That is when the accident or the injury occurred.

Now, what's important about those facts is she was not picking up her friend. She had not been briefed on the standards of postoperative discharge care. And from that, it's our position that she was not assisting in providing care when she was injured.

THE COURT: So your position would be

different if she had left and come back rather than just go out to the parking lot, make a call and come back into the facility? Is that it?

MR. HALLMAN: No, Your Honor. What I'm getting at is that it's different because she had not been briefed by a doctor or a nurse on what she would be doing. Joan never planned on doing anything more than dropping off her friend and picking up her friend, nor was she ever told by the defendant or the affiliates of the defendant that she would be assisting in providing healthcare.

THE COURT: So she didn't -- okay. So she didn't consent to being a responsible adult; she was just simply identified as a responsible adult by her friend?

MR. HALLMAN: She had not yet undergone any training or had not been told any of the guidelines for what she would be doing as a responsible adult.

THE COURT: But that wasn't my question, though. I mean, did she actually consent to be -- I don't know -- and again, I may have to go back into the motion to dismiss. Did she consent to being a responsible adult? Had she signed some form or, you know, recognized that she was going to be the person responsible for not only just picking up the person who

had been operated on, but also for receiving the postsurgical instructions and --

MR. HALLMAN: No, Your Honor. From her affidavit, all she was doing was serving as a ride for her friend. Her name was listed by the friend --

THE COURT: By the friend who had been treated?

MR. HALLMAN: Right. Her friend gave her name, and someone wrote it down. But, no, Joan did not sign anything.

And in addition, on Defendants' supplemental briefing for this hearing today, on page 12, the defendant makes an admission that Plaintiff was not able to perform these duties. It's in their own briefing that she did not do any of these duties because she was injured before she was briefed on what duties she might be responsible for.

And that's the main distinction I wanted to make from the original discussion I just heard. I'm prepared to go through the *Ross* factors and explain to you why under *Ross* this is not a healthcare liability claim.

THE COURT: Well, please do.

MR. HALLMAN: Okay. Factor one: Did the negligence occur in the course of defendant performing

tasks with the purpose of protecting patients from harm?

The defendant was not doing anything when this injury occurred, much less a task. There was no task being performed. Automatic doors malfunctioned. And even in the event that you might find a task was being performed, that task was being performed for convenience and not safety. If safety was the true motive, the doors at issue created hazards rather than removing hazards. Automatic doors that would retract into a wall pocket, those would be in the name of safety. When you have automatic doors that swing through the entrance area where patients in wheelchairs might be, it's foreseeable that those swinging doors are going to hit someone, possibly someone who's not paying attention.

THE COURT: I can only hear defense counsel saying, that's why you need an expert report. If you're taking the position that somehow these doors were hazardous or that they were a danger in themselves just because of the way they swung out, I think that kind of strengthened his hand by making that statement. And probably the first thing he'd say is you're not qualified to make it yourself. But go ahead with the rest of your argument.

MR. HALLMAN: And that's just the first

factor. Just to reiterate, the defendant was not doing anything, much less performing a task.

Number two of the *Ross* factors: Did the injuries occur in a place where patients might be during the time that they are receiving care?

Your Honor, these -- these injuries occurred in the entrance to the ambulatory care center, and that is not an area where patients are receiving care. The court of appeals in *Camacho* held that a hospital entrance is not an area where patients are receiving care. And that's -- that's as simple as my argument gets on number two. And importantly, in their supplemental briefing, the defendants failed to address this substantively. If you read it, they did not really answer why the entrance is an area where care is provided.

On number three, number three is not contested by the defendant.

Number four: At the time of the injury, was the claimant providing or assisting in providing healthcare?

And again, I'll refer you back to the admission. Plaintiff was not able to perform the substantive postoperative duties for her friend.

THE COURT: So in other words, she

shouldn't be forced to file an expert report because she never got an opportunity to assist? Like if she had been --

MR. HALLMAN: Among many other more important reasons.

THE COURT: I think your argument basically is that at the time she was injured, she wasn't doing anything to assist in healthcare. If she had been injured on the way out of the facility after she had been told, as a responsible adult, what needed to happen postoperatively, these are the medications your friend needs to take, and received all the standard postsurgical instructions, not that they're necessarily -- when I say "standard," we use that word loosely. You get the written and oral instructions and the notes of the doctors as to what's supposed to happen after surgery. If she's walking out the door and that's when she's injured, after she has been identified as a responsible adult and taken those instructions, then perhaps your argument would be different. Do you concede that it would be?

MR. HALLMAN: I think that's a very important distinction that I'm trying to make. But at the same time, it's not dispositive whether or not she had been briefed. These factors are not exclusive and

neither -- no individual factor is going to be dispositive. But I am -- yes, that is what I'm getting at. She was not providing any sort of care when she was injured, nor had she been prepared or briefed on how to provide that care.

THE COURT: You know what's interesting about all this is that if the responsible adults that are required by the legislature --

MR. BYRD: Yes, Your Honor.

THE COURT: -- again, that's the -- you would think that before -- it's almost like there would be some -- they would have developed some type of form for these responsible adults to sign before they assume those duties.

Because essentially, what you are -- if you've got a friend saying, Hey, look, man, can you pick me up? I'm having surgery tomorrow. I've got to get something cut on and -- let's say it's just a meniscectomy or something like that in your knee. Okay? You're in and out of surgery in 45 minutes. You ask a buddy to pick you up. You identify your buddy as the responsible adult. Your buddy doesn't have any idea, number one, that he's been designated as such. He just agreed to pick you up at the hospital after you got out of surgery.

You know, there's no recognition that they are, in fact, assisting in the rendering of healthcare. You're walking in just to pick up your friend. And so someone else, the treater, is basically deciding your classification, you know what I mean, when it comes to whether or not you are a licensee or invitee or a responsible adult, not a responsible -- like just there to visit, just there to -- your designation is being provided to you by someone -- or assigned to you by someone.

You haven't even assumed those roles necessarily with knowledge that you have been given that responsibility. Your friend may have designated you as such, and you have no idea. You just agreed to pick them up. The treater has identified you as such and won't let you out of the facility without that responsible adult coming in, and you haven't signed a thing.

You haven't signed a thing assuming responsibility for any -- you know, being the responsible adult and all that entails under Texas law. You just agreed to pick your friend up, and all of a sudden, whether you are aware of it or not, now the facility gets to treat you differently if you were to be injured. And also, you have an official, evidently, job

duty in the fact that you are assisting in the rendering of healthcare just by agreeing to give your friend a ride.

Again, I'm doing a rant, and I'm sorry that I'm doing it, but this is part of the problem. It just -- I mean, if I'm going to have -- if I'm going to be assisting in the rendering of healthcare, I would expect most healthcare facilities to at least have me sign something acknowledging that I'm picking my friend up and that I am going to relay to my friend once the anesthesia wakes off -- wears off -- I'm sorry -- the postsurgical instructions that have just been given to me by the treater, I'm going to give the written instructions that I got from the nurse or the doctor to the patient so that they follow the doctor's advice. Evidently, these responsible adults don't have to sign anything before they leave with the patient. And is that -- there's nothing that's being signed?

MR. BYRD: I'd have to look into that.

MR. HALLMAN: Not that's been presented.

THE COURT: That is a big deal.

MR. BYRD: I understand, Your Honor.

THE COURT: So, I mean, it's one thing if -- look, if you're acknowledging that you're taking this role on yourself and you're

assuming these -- that you're agreeing voluntarily to provide these instructions from the treater to the patient once the patient becomes, for lack of a better word, competent to actually receive that information after the anesthesia wears off, then maybe there's an acknowledgment, you know what, yeah, I'm assisting in the rendering of healthcare, but you're not asked to sign anything. You may not even know that you're the responsible adult. You're just the buddy who agreed to give him a ride home from the hospital. It's just -- it is -- again, it just seems to me -- go ahead. I keep interrupting your argument, and I'm sorry.

MR. HALLMAN: No, you're fine, Your Honor.

Halfway through your argument, I wanted to say that the treating physician here is not a defendant. We are suing a landlord entity only. I just wanted to clarify that.

And to support the discussion we just had, I want to refer you to *Scoresby v. Santillan*, which I cited in the first sentence in my argument. The purpose of this expert report requirement is not to have these claims dismissed regardless of their merits; it's to deter and identify frivolous lawsuits. And that's from the Texas Supreme Court.

Okay. Moving on to element number five

from *Ross*: Is the negligence based on safety standards arising from professional duties owed by the healthcare provider?

Once again, KSADD, the defendant, is not a healthcare provider; they're a landlord entity. Our complaint is a premises liability complaint. It's based on defective front entrance doors. There's no allegations here that the doctor did anything wrong or that any healthcare standard was violated. The complaint is just a premises claim.

THE COURT: Well, you understand defense's position is a little bit different than that.

MR. HALLMAN: I do. I think --

THE COURT: Comply with the government code and --

MR. HALLMAN: Well, the admin code, there's two sections cited. One section requires responsible adults, which I don't believe is applicable to our premises complaint. The other admin code requires the defendant -- it says that the defendant shall eliminate hazards that could lead to slipping, falling or other trauma.

And I'm just summarizing what it says. There's no requirement that the defendant install automatic doors. There's no penalty if defendant chose

not to install automatic doors. It's an elective building design-type thing to install these automatic doors. There's no regulation that's been cited in anything that defendants produced or referred to that makes automatic doors mandatory.

And in *Camacho*, the automatic doors were even closer to being something that would be a healthcare specific door. Those doors were tied to infant alarms that were on infants' ankles, and those doors would close whenever an infant was approaching the door prior to being dismissed from the hospital. These doors are just doors. *Camacho*, those doors were found not to be a healthcare liability claim, and I think that strengthens my argument substantially.

Number six, and kind of keeping with the door thing: Is an instrument -- if an instrumentality was involved in the negligence, was it a type used in providing healthcare?

No. At no point does the defendant in his supplemental briefing argue that the doors in question were of a type used in providing healthcare. Mr. Byrd referred to his expert, Mr. Hines and the affidavit prepared by Mr. Hines. If you read that affidavit, it does not say that these doors were of a type used to provide healthcare, as required by the factor in *Ross*.

The door is a regular Stanley automatic door.  It's not a Stanley healthcare door.

And I -- may I approach, Your Honor?

THE COURT:  Sure.

MR. HALLMAN:  Mr. Byrd, here.

I'm just going to show -- this is from the Stanley website.  This is a product listing of the door in question, Your Honor.

THE COURT:  Sure.

MR. HALLMAN:  And then, here is a product listing of the doors that are not in question.  These are also made by Stanley, and those are healthcare doors.  And what I'm getting at with that is that KSADD could have chosen to buy and install healthcare specific doors, but they didn't.  They installed doors that you see at malls, grocery stores, Target, other places.

So tying that to the factor, there's nothing special about these doors that makes them a door that is of the type used in healthcare.

And finally, factor number seven:  Did negligence occur in the course of Defendant taking action or failing to take action necessary to comply with safety-related requirements set for healthcare providers by governmental or accrediting agencies?

And I do understand that this is similar to

factor five. But once again, the alleged negligence is a door malfunction, not that defendant didn't comply with the safety regulation. There's no requirement that the defendant have these special doors. There's no penalty or fine to defendant if they don't have these special doors. And in this case, having normal doors would have prevented the injury.

I don't know if Mr. Wolf has anything, but that is my analysis. And I think *Ross* and *Camacho* require a finding that this is not a healthcare liability claim subject to the expert report requirement. And stepping away from the factors, I think it's pretty clear that this is a -- primarily a premises case, not a healthcare case that should be dismissed with prejudice against my client.

Thank you, Your Honor.

THE COURT: Okay. Anything to add?

MR. WOLF: Briefly. I have -- one, there is no *Camacho* 1 and 2. There is just *Camacho*. When we have a 1 or 2 scenario, it would be like Volkswagen 1, Volkswagen 2. There's only one *Camacho* case. It was controlling, presumably, in the underlying motion, and now it devastates the underlying motion. It is just simply *Camacho*. That is the only thing I'd like to point out to the Court.

THE COURT: When you say it devastates --

MR. WOLF: It's --

THE COURT: -- it really -- I mean, it really is kind of -- because -- and I realize that the Supreme Court has listed out seven factors, but if -- there are certain -- there are certain of the seven, I think that you would agree with me there are a couple of them that are probably more important than the others. If you're -- if you're actually -- at the time of the injury, if the claimant was in the process of seeking or receiving healthcare or they were providing or assisting in healthcare, that either one of those could be enough.

MR. WOLF: Could be. And if -- you would have to weigh it. But step back for a minute. The hospital was the healthcare provider in *Camacho*. This is -- the Supreme Court said, and *Camacho* Court took the cue, this is not a simple but-for. But what you're hearing, in spite of *Ross*, is you're hearing a but-for argument by a non-healthcare entity against a non-healthcare recipient. This is a long way further away from 74 than even *Camacho*.

At least *Camacho* had a healthcare provider. We don't even have it. We have an affiliate that has never practiced medicine, and they can never meet any of the tenets of practicing medicine or complying with

regulations because they don't apply to KSADD. So these duties that are being argued here are new duties that would be formed between a non-healthcare provider and a non-healthcare recipient somehow under Chapter 74 that don't exist under Chapter 74. That's why I say it's devastating.

MR. BYRD: Brief response, Your Honor.

THE COURT: All right. Yes, please.

MR. BYRD: Okay. Just to follow up on Mr. Wolf's statement about KSADD, that KSADD is somehow not a healthcare provider, that's just wrong under the statute. You have to pay attention to the definitions, and that's really what this is all about, these definitions.

They didn't cite 74.001(a)(10) once in their response. And 74.001(a)(10) is actually the definition of a healthcare -- of healthcare. It's not --

THE COURT: The definition of healthcare or healthcare provider?

MR. WOLF: Provider.

MR. BYRD: It's --

THE COURT: Hang on. You said 74.0010?

MR. WOLF: 001.

THE COURT: 001. Okay. Hang on a second.

MR. BYRD: Let me pull that up. It's (a)(10).

THE COURT: Okay. All right.

MR. BYRD: It's not cited once in their brief. And we went through in painstaking detail how KSADD was an affiliate. It is -- we also prepared a supplemental affidavit regarding -- it's been delegated the duty of North Texas Team Care Surgery Center, as far as those duties relate to safety for patients in the facility. I don't understand how *Camacho* 2 -- and there are two *Camacho* cases.

MR. WOLF: No. There's a withdrawn *Camacho* case.

THE COURT: Yeah. There's -- yeah.

MR. BYRD: There's a subsequent *Camacho*. Okay. As long as we're referring to the same case.

MR. WOLF: Well, yeah.

MR. BYRD: It agreed that having those doors was -- *Ross* element one, it said, that's fine. That was it, but that's not -- so that is in no way devastating at all to our case because, as you pointed out, it didn't occur during healthcare. That was the presumption in *Camacho*, which is the most important factor. And this is -- Plaintiff's counsel was testifying about --

THE COURT: And so, in your mind, the defendant that's left is just simply the property owner, which is an entity owned by Dr. Kikkeri?

MR. BYRD: Yes, Your Honor. It's the landlord entity that has the duty of maintaining the premises and the fixtures as appropriate for a surgery center --

THE COURT: Healthcare facility.

MR. BYRD: -- and office practice. Yes, Your Honor. And it all goes back to Dr. Kikkeri. He's in complete control of that entity.

THE COURT: Are they a healthcare provider?

MR. BYRD: Yes, Your Honor, because they're an affiliate, and an affiliate is a healthcare provider.

THE COURT: Where does it say that?

MR. BYRD: You know, I didn't print out my -- do you have your 74 with you?

THE COURT: Yes, I do, actually.

MR. BYRD: Thank you, Your Honor.

THE COURT: Sure. Take your time.

MR. BYRD: I'll use sticky notes. Here's affiliate, and here is healthcare provider specifically. Let me see. Affiliate right here, and here's why Dr. Kikkeri -- it is his affiliate because he has control.

THE COURT: Let me see.

MR. BYRD: Yes, Your Honor.

THE COURT: All right. So 74.001(a)(1), that defines affiliate. All right. So -- okay. So what you're saying is that healthcare provider, when you go to 74.001 -- do you guys have a copy of it there in front of you?

MR. WOLF: Yeah. I said earlier, a moment ago: Although they are an affiliate.

THE COURT: Okay.

MR. WOLF: We acknowledge they're an affiliate. And to take your point a little further, if his wife -- they bought a car to get him to work every day to where he would go become a healthcare provider, and on the way to work she were to run over some pedestrians, their argument would be that 74 applies because that's in connection with healthcare. There are so many absurdities in this, but --

MR. BYRD: Your Honor, that's --

MR. WOLF: -- but that *Camacho* language, Judge, where it says: Not seeking or receiving healthcare at the time of the injury, not providing or assisting at the time of the injury, it didn't happen where patients receive it, that's the new, the actual *Camacho* holding. There's no *Camacho* 1.

THE COURT: Right, right. You made that point. I just want to make sure -- so it's -- the point generally is that this idea that somehow they're excused from 74 because it's only the property owner, the landlord here that they're suing, that's just not the case. That's point number one which you want to make.

MR. BYRD: Yes. If you pierce the corporate veil, it's Dr. Kikkeri.

THE COURT: Okay.

MR. BYRD: It's his affiliate.

THE COURT: All right. What else?

MR. BYRD: They -- they said that this is -- this statute was not designed for this kind of case; it was designed to weed out frivolous cases. Well, there's two points to that.

What is frivolous? Well, there's a liability question, and there's a damages question. And to respond in kind to Plaintiff's counsel, I think on the liability, this is a frivolous case. On damages, however, unfortunately for Ms. Williams, not frivolous. There are some serious damages here. But you don't get a case just from damages alone; it takes liability. And that's why it's nice for healthcare providers to have expert reports in situations like this.

MR. WOLF: I take exception to that. There

can be frivolous defenses the same way there can be frivolous claims.

THE COURT: Yeah. I just -- look, when they crafted the legislation, the idea was to try to -- there was -- you remember, obviously, there was a big thing about all this alleged crisis with medical fraud -- you know, frivolous medical malpractice lawsuits. All right? And now they have interpreted this statute, which was evidently created to address this crisis -- and I use that word loosely --

MR. BYRD: I understand.

THE COURT: -- that has been interpreted in such a way that safety has been -- instead of safety, specifically in somebody -- in regards to somebody putting their hands on you and not treating you properly or giving you the wrong medicine or putting in your IV incorrectly, now we're talking about, well, if you're a patient there at the hospital, like the example I gave you, you walk out of your room, and you slip and fall on some water, you're a patient at the facility, you're done. That's just -- and, you know, it has nothing to do with -- remember the whole crisis was about how medical malpractice premiums had skyrocketed, and all the doctors needed this protection, and they -- and this particular type of claim wouldn't even be a -- it would

be covered by typically an insurance policy that's just a general premises liability policy, not a medical malpractice insurance policy.

So again, safety has been interpreted in such a way that it really doesn't have anything to deal with medical malpractice anymore. It's -- but I know that you had to argue it differently, and I respect you for doing your job. I just -- I don't want you to take my rant as being some kind of -- I just -- to me, it has led to absurdities, and that's what my position is on it.

Now, whether or not they have to file a Chapter 74 report, my big concern here is -- I do agree with you that, look, this lady was not there just to act as a visitor; she was there to act as the responsible adult, but she didn't know it. There's no evidence in the motion that she knew that she was assuming these duties voluntarily. Somebody had identified her as such. So she doesn't even know that she's there to assist in the rendering of healthcare.

She's just -- again, just like in the everyday world, one buddy's going in for a surgery, another buddy asked him to pick him up after he wakes up. And they just go, Sure, man, I'll pick you up, and then you slip and fall or you have your head crushed by

a door, some other type of -- seriously, your argument could be if I was walking from the parking lot into the facility and I came around the corner and there was a gigantic hole that they had cut in the sidewalk -- and you and I would both agree that you need to put up a barrier to prevent people from falling in -- you turn the corner, and you're there to pick up your buddy. You're a, quote, responsible adult. You don't know you've been necessarily designated as such. The hospital hasn't required you to sign any type of forms recognizing what your duties are, the fact that you've got this special role. You're just a pick-up guy. You're on your way in, you fall in the hole -- and by the way, if I fall on top of someone who was there five minutes before who just came there to visit their buddy, you'd be treating them differently than me because I have been declared a responsible adult. Both of us fell in the hole, and you needed to tell us about the hole.

That's what I'm talking about when I'm talking about absurd results, and it just -- that's what it would be. The courts of appeal -- I mean, it's a mess. They have strained so far on this safety stuff that it leads to some absurd results.

Look, I'm going to take this under advisement, but I think my biggest problem is this idea

that they were assisting in the rendering -- or providing of healthcare.  And I know that she's been designated as the responsible adult, but without some -- some evidence to show that she knew she was -- you know, I could designate you, Mr. Byrd, as my responsible adult.  You wouldn't have any idea when you're there to pick me up from my surgery that you have been designated as such.  All I asked you to do is pick me up.  But you show up, you haven't had -- you don't have any idea that you've been designated as a responsible adult, you don't really have any idea that technically you are assisting in the rendering of healthcare, but now you are according to the treatment facility.

MR. BYRD:  Yes, Your Honor.  And just briefly to respond?

THE COURT:  Sure.

MR. BYRD:  I do know because I have had ambulatory surgery twice.

THE COURT:  Sure.  You do.

MR. BYRD:  And so if you --

THE COURT:  Sure.  And I do, too.

MR. BYRD:  So has the plaintiff.  She had it by Dr. Kikkeri in 2007.  She had a ride home.  She had to designate someone to drive her home.  There is -- and just from a technical causation standpoint,

there's no evidence in the record she would have said -- and let's just say she makes it through the door, there's no incident, right? Okay.

THE COURT: Sure.

MR. BYRD: She continues to fulfill her duty as a responsible person. There's no evidence she would have heard: Okay, these are the discharge instructions, and she says, Whoa, no. I'm leaving. I'm out of here. I didn't sign up for this.

There's none of that. There's no causation issue in the record about that, that she would have refused these duties if she hadn't remembered them, which she -- she probably had a general idea of them because she had a surgery from Dr. Kikkeri several years earlier.

MR. WOLF: In response to that, Your Honor, this place didn't exist in 2007. Where this happened didn't exist. It was a field, number one. Number two, the evidence before the Court that's not refuted is that she had not been informed by anyone that there were any special procedures. So at the time she's in that vestibule, she's just going to pick up a friend. She hasn't started this business of becoming the agent of the doctor to care for this post-PACU patient. It just hasn't happened yet. Factually, they can't get there.

And using a surgery that she had for herself and whatever procedures there were in 2007, to say that she must always know that all people -- the -- you spoke of absurdities. That's not even a point of evidence here.

THE COURT: That's why it is so factually intensive. And I -- at one point, I discussed, and I think Mr. Hallman, as he was talking, and I asked him, Would your analysis be different if she actually had the patient in the wheelchair pushing her out the door? She had assumed the duties of --

MR. WOLF: It is splitting absurd --

THE COURT: She didn't -- even if she didn't have to sign a form, if she had gone into the room and picked up -- you know, was there to pick up her friend, she's there with the nurse or the doctor, they've already put her in the wheelchair because they're not going to let her walk out, and she's gotten the written and postsurgical written instructions, she may have got the prescriptions that her friend's been prescribed, she's been given oral instructions by the treater, so maybe then, on the facts --

MR. WOLF: Maybe.

THE COURT: -- she's assisting in the rendering of healthcare.

MR. WOLF: But --

THE COURT: If she's assisting, knowing that that person can't leave, maybe then, factually, she can't argue, even if she didn't sign off that she knew she was assisting in the rendering of healthcare. But she's not there --

MR. WOLF: She never got there. She never got to that point. She never got those instructions. She never became a willing or unwilling participant in healthcare. She never got there. In fact, the only evidence in front of the Court is: I was never informed by the doctor of any special routines or procedures that I needed to follow, et cetera.

It's in her affidavit. She never got past the doors. She never got the instruction to be then the person taking care of her. She was never the person taking care of -- and I respect what the Court is saying because I completely agree with it, the absurdities here. But even if we have splitting the hairs, the case that he's asking you to split and go down that analysis, she never got into the building. She never got the instructions. She never got to be part of any healthcare.

THE COURT: She was in the building, I think, Mr. Byrd.

MR. BYRD: Yeah.

THE COURT: She was in a waiting area. She had to go through two doors to get into the --

MR. WOLF: To get back in after the phone call, right. But she never got the instructions. She never got any special any of it. She never became a participant, willing or unwilling, in the healthcare of this patient. And that's what their arguing. Well, she was going to be the responsible adult. She never got there in time. The accident happened before she received any --

THE COURT: Right.

MR. WOLF: -- special instruction. And that is splitting absurd hairs, but if we go and look at it that way, the only evidence in front of this Court is she didn't do it. She never got there.

MR. BYRD: Brief response, Your Honor?

THE COURT: Sure. And that's kind of what my -- I went down a tangent, Mr. Byrd, and I said, Well, what if it was a hole in the ground, and I mean, she could have been outside calling her friend or smoking a cigarette or something like that, and she's walking back in to be the responsible adult, she falls in the hole. Your argument would be the same, wouldn't it? She was there to provide -- she -- I mean --

MR. BYRD: If she --

THE COURT: I mean, it's about -- I mean, obviously, again, healthcare facility, if you had a hole in the sidewalk and you're entering or leaving, then you would rope it off. You would agree with me that you wouldn't want any of your patients to fall in a hole or anybody there. I mean, again, this is -- it's basically the same thing, isn't it? But she just never got an opportunity to do what she was -- what would definitely be -- well, I shouldn't say definitely because I know plaintiffs don't want to follow me there -- but there's a stronger argument to be had from your side if she was actually participating as the responsible adult at the moment that she was injured. She didn't even get an opportunity to do that, right?

MR. BYRD: Well, she was by showing up to give a ride. That is enough. That is showing up -- you have -- you have to show up in order to provide anything. Okay? And she was there. She came there -- she answered an interrogatory: What was your purpose? I was there to be the driver -- designated driver, her words. So she answered -- so she had done enough to qualify under -- one of the ten or so things in our -- of the postoperative duties of the responsible adult is safe transportation home. She has shown up to do that. That is enough. We -- we provide a surgery to her

friend in expectation of her coming. We had her name, her phone number. We were expecting her. She wouldn't have been released to anyone but her. This is -- the lady who had surgery, she's in PACU. She's waiting for her friend to pick her up. Her friend's coming in to pick her up. That's -- that is a whole --

THE COURT: All right. Okay. Anything else? Y'all have proposed orders?

MR. BYRD: We do, Your Honor.

MR. WOLF: Yes. Approach?

THE COURT: Yes, please. Thank you.

MR. WOLF: Are we done?

THE COURT: Yes, you can go off the record. Thank you.

(Proceedings concluded at 2:48 p.m.)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS   )
COUNTY OF DALLAS     )

     I, Coral Hough, Official Court Reporter in and for County Court At Law No. 4, Dallas County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

     I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

     I further certify that the total cost for the preparation of this Reporter's Record is $515 and was paid by Thiebaud Remington Thornton Bailey LLP.

WITNESS MY OFFICIAL HAND this the 27th day of July, 2015.

                        _____/:/ Coral Hough_____
                        Coral Hough, Texas CSR 9007
                        CSR Expiration Date:  12/31/2014
                        DALLAS COUNTY COURT AT LAW NO. 4
                        George L. Allen, Sr. Courts Bldg.
                        600 Commerce Street, Suite 575
                        Dallas, Texas  75202
                        (214) 653-7468 (office)
                        (214) 653-6175 (fax)